---

## Case No. 7,827.

### KINNEY v. CONSOLIDATED VA. MIN. CO. et al.

[4 Sawy. 382.] [1]

Circuit Court, D. California. Nov. 1, 1877.

MINING LAWS AND CLAIMS—DECREE WITHOUT ALLEGATIONS TO SUPPORT IT — MISTAKES FOR AND AGAINST GRANTOR — UNSTAMPED CONVEYANCES AND SUBSEQUENT STAMPED CONVEYANCES — UNSTAMPED CONVEYANCE REPUDIATED — EQUITY—CONVEYANCE TO DEFRAUD CREDITORS — EQUITY—INFERENTIAL OR ARGUMENTATIVE PLEADING—CONSCIOUS IGNORANCE — MISTAKE, WHEN CORRECTED IN EQUITY — NEGLIGENCE — MISTAKE—LACHES — MISTAKE — STATU QUO — EFFECT OF CONVEYANCE, PENDENTE LITE, WITHOUT ACTUAL NOTICE OF PRIOR UNSTAMPED DEEDS — PAROL CONVEYANCE OF A MINING CLAIM VALID—THE UTAH STATUTE OF CONVEYANCE—NO MISTAKE.

1. Where a mining claim is made and actually possessed and worked for several years, the claim and location being generally recognized as valid by the miners in the vicinity, the title of the claimant is good, even though the location may not have been originally made in strict accordance with the mining rules in force at the time, especially so as between the co-claimants and their grantees.

2. Where, in an action under the statute of Nevada, by a portion of the owners in possession of a mining claim against parties out of possession, to determine an adverse claim on a complaint alleging only title and possession in plaintiffs, and the adverse claim of defendants, a decree had been rendered in favor of the complainants; and at a subsequent term of the court, without further intermediate proceedings, a supplemental decree was entered, purporting to be by consent, adjudging the title to the north twenty feet to be in two of the plaintiffs, and that the title to the remaining portion of the claim remained in all the plaintiffs, according to their respective rights: *Held*, that the supplemental decree is void, as a decree of the court, on the grounds: 1. That there are no allegation in the pleadings or record upon which to base it; 2. That it was made after the rights of the parties had been adjudicated, and the case had been fully ended, and the term of the court thereafter finally adjourned; 3. That a portion of the co-owners were not parties to the proceeding, and their interests could not be affected.

3. Such supplemental decree, where treated as valid, and subsequently acquiesced in for several years by the parties interested, may possibly be regarded as written evidence of an agreement to partition upon the terms specified in the decree.

4. Kinney, the principal plaintiff in the case, since said decree; and Kinney and the defendants in this case in the transaction now in question, having acted upon the hypothesis that twenty feet were set off to Kinney and Welton

---

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

in severalty, by said supplemental decree. without any mistake of fact on Kinney's part. and this being the only hypothesis upon which defendants can obtain all the interest in said mine, which they have purchased from Kinney and his grantees, and paid for, equity requires that the court should act upon the same hypothesis, and there is no such mistake as a court of equity will correct.

5. If a party, in making a conveyance of one part of a mining claim, makes a mistake against himself as to the amount conveyed, and in another part of the same conveyance makes a mistake in his favor of a corresponding amount in another portion of the same mine, and the grantee obtains no more in the aggregate than he purchased and paid for. the equities are equal, and a court of equity will not, on the application of the grantor, reform the conveyance by correcting the mistake against him, to the injury of the other party upon the entire transaction.

6. Where a party, while the acts of congress requiring conveyances to be stamped are in force, makes a conveyance without affixing a stamp thereto, and the grantee in such unstamped conveyance conveys subsequently by deed, duly stamped and in all respects valid, the grantee under the deed properly stamped takes the title unaffected by the failure to stamp the prior deed.

7. Where K. conveyed interests in a mining claim to W. and M., respectively, by unstamped conveyances, who afterward conveyed the same to C. by conveyances good in form; and K. afterward conveyed his remaining interest to C., and then filed a bill in equity against C. to correct an alleged mistake in the latter conveyance, on the ground that he conveyed more than was intended; and in order to make out the mistake it is necessary to repudiate his former unstamped conveyances to W. and M., a court of equity will not correct the mistake in order to allow him to avail himself of the advantages to result from repudiating his prior unstamped conveyances. Equity requires that he should make good his prior void conveyances, and he who asks equity must do equity.

8. A conveyance given for the purpose of putting property beyond the reach of creditors is fraudulent, and a court of equity will leave the parties where it finds them. It will refuse the fraudulent grantor any relief founded upon the idea that the grantee holds the property thus fraudulently conveyed in trust for his benefit; and no such trust will be recognized in equity for the purpose of working out a mistake, to serve as the foundation for reforming a subsequent conveyance from the grantor to parties taking through the fraudulent grantee, without notice of the fraud, and holding the property fraudulently conveyed.

9. Inferential or argumentative pleading is inadmissible. A fact can only be put in issue by a direct allegation in such form that the other party can take issue directly upon it.

10. Where parties deal with each other with the knowledge, and in view of the fact, that something is uncertain as to the amount or condition of the subject-matter of their dealings, and the contract relating thereto is in the form intended, there is no ground for correcting a mistake in a court of equity, if it should finally turn out that one has intervened.

11. Relief on the ground of mistake in cases of written instruments will only be granted where there is a plain mistake clearly made out by satisfactory proofs.

12. Mistake, to be available in equity, must not have arisen from negligence where the means of knowledge are clearly accessible. The party complaining must have exercised at least the degree of diligence which may be fairly expected from a reasonable person.

13. Where a party desires relief in equity on the ground of mistake, he must act promptly on discovery of the mistake, or he will be regarded as waiving the objection, and be bound by the contract to the same extent as if no mistake had occurred. This is specially true in the case of speculative property which is liable to large and constant fluctuations in value.

[Cited in Great West. Min. Co. v. Woodmas of Alston Min. Co., 23 Pac. 911.]

14. A court of equity is reluctant to grant relief on the ground of mistake. unless the parties can be put in statu quo. If this cannot be done, it will grant such relief only where the clearest and strongest equity imperatively demands it.

15. K. conveyed portions of a mining claim by unstamped and unrecorded deeds to W., M. and L., who, together with their grantees, by various deeds, conveyed the same to C. K. subsequently conveyed to C. all his interest in the same mining claims by valid deeds duly recorded, and C. went into possession under said several conveyances. K. afterward filed a bill in equity against C. to correct a mistake in his said conveyance to C., and, pendente lite, conveyed all his interest in said mine to one of his counsel of record in the case and another, without actual notice of the said prior unstamped and unrecorded deeds, and said parties were made parties by supplemental bill simply alleging the conveyance pendente lite: Held:—1. That C., having a good conveyance upon record from K., of all his interest in the mine, and being in possession, there was nothing left in K. which he could convey to his said grantees, pendente lite, except such equity as he had as against C. to have his prior conveyance reformed on the ground of mistake; 2. That if K. had no equity to reform his said deed, and K.'s said grantees, pendente lite, took any equities as against K.'s prior grantees under said unstamped and unrecorded deed, then C. having before obtained conveyances from said prior grantees in the unstamped and unrecorded deeds, had their equities. which were at least equal to the equities of K.'s said grantees pendente lite: and C. being in possession his possession is best, and a court of equity will not interfere to disturb it: 3. That by purchasing the subject-matter of the suit. pendente lite, the said grantees of K. took with notice of all the rights of defendants. and subject to any judgment or decree that might be entered in the case; and since no new equities were alleged, but only a transfer of the subject-matter of the action, with a prayer for the same relief, the decree must be the same as it would have been between the original parties; 4. That the actual sole possession of the defendants of the mine at the time of the said conveyance. pendente lite. imparted notice to the purchasers of the title and all equities of defendants: 5. That the purchasers pendente lite, Smith and Bryant. are in no better position than the complainant, their grantor.

16. In early days, in Nevada, the actual transfer of the possession of a mining claim with a view of passing the title followed by an actual possession of the transferee, acquiesced in by the party transferring it, was a valid transfer of such claim. Any other ruling would disturb many old and valuable titles on the Comstock lode.

17. The Utah statute of conveyance of January 18, 1855, had no application to mining claims.

18. There was no mistake in the conveyance in question.

Bill in equity to reform a deed to a portion of a mining claim on the ground of mistake. Prior to April, 1872, complainant, Kinney, owned an interest in the mining ground then known as the Kinney ground, and the Kinney and Welton ground, within the lines of

what was then the Consolidated Virginia Mining Company's claim. Sometime prior to this date he had expressed a wish to defendant, Heydenfeldt, that the Consolidated Virginia Mining Company would purchase his interest. The proposition was made, but declined on the ground that, at that time, the mine was being prospected by assessments without knowing whether it was valuable or not; but the company offered to take Kinney's interest and issue stock for it. This was declined on the ground, that he could not pay the assessments on the stock then being levied for working the mine. In April, 1872, defendant Flood, was desirous of buying in all outstanding claims to ground within the company's lines; and among others mentioned complainant's ground. Thereupon defendant, Heydenfeldt, wrote to Kinney at Eureka, Nevada, that there was a probable opportunity of selling his ground. On April 7, 1872, defendant, Heydenfeldt, in response to said letter, received from complainant Kinney, a telegraphic dispatch as follows, to-wit: "Eureka, April 7, 1872. Received at San Francisco, April 7, 1872, 7.10 p. m. To Hon. S. Heydenfeldt: Wrote to-day. Will send deed to-morrow; sell all I have at your own price. G. W. Kinney."

A few days thereafter, the defendant, Heydenfeldt, received from complainant a letter, in words and figures as follows: "Eureka, Nevada, April 7, 1872. Hon. S. Heydenfeldt, San Francisco, Cal.—Dear Judge: Your favor of the fourth instant is received and contents noted. I own the undivided one-half of the twenty feet and one-tenth of a foot adjoining the Central No. 2 on the south, unincumbered. This is the ground I spoke to you about. Sunderland, when president of the Consolidated Company offered me $800 for it once, for the purpose of absorbing it in the Consolidated Company. The abstract in possession of the company shows that I only own two feet (or twenty shares) in the Kinney ground, proper. There should be five (5) feet more. This five feet, as I understand it, stands in the name of Luther R. Mills (cousin of D. O. Mills). I hypothecated this amount to him once, and always thought (until I saw your abstract) that it had been properly reconveyed. You understand the position of things much better than I do. Act for me, judge, as you think best. There will be no quarrel between us as to price. I have been poor too long. Not having signed the incorporation of the Virginia Consolidated Company, I have paid no assessments. I do not know where L. R. Mills is, and would like to convert the shares into cash. To-morrow I will send you a deed to anything I may have on the Comstock range, and also a power of attorney, so that you can take your choice of mode of operating. Sell the ten feet in the twenty at your own price, and I will be satisfied; and also whatever your abstract allows me in the Kinney ground proper. The stage will start soon. Truly yours, Geo. W. Kinney. P. S. Act fully as for yourself, and I will indorse what you do. K."

In a day or two afterward, defendant, Heydenfeldt, received from complainant another letter, in words and figures as follows: "Eureka, Nevada, April 8, 1872. Hon. S. Heydenfeldt, San Francisco, Cal.—Dear Judge: Yours of the fourth instant received and hurriedly answered yesterday. I also sent you a telegram same day. I inclose a deed to my interest in 'Kinney and Welton,' and 'Kinney' in Virginia district, and the 'Defiance' in Gold Hill district. This latter may be of no value to you now, but sometime it may have. It was located and recorded in 1860, and lies directly in front of the Overman. The Overman Company subsequently took possession of the ground adverse to the Defiance. Before the limitation law of Nevada went into effect, suit was brought to recover the ground, with Quint & Hardy as attorneys. Not having been in that part of Nevada since, I do not know what became of it. The location was originally made with the assent and knowledge of Overman. Of the value of the property in Virginia district, you know much better than I do, and you are at liberty to name a reasonable price yourself, believing that you will do right by me. The consideration in the deed is left blank, for you to fill up. The segregated twenty feet adjoining the Central No. 2 is as I left it in 1865, still on the judgment-roll, No. 1010, or 1110, I forget which. A few days prior to my leaving San Francisco, you showed me the abstract of the ground within the lines of the Virginia Consolidated Company. This showed me an owner to the extent of two feet only. I stated there was five feet lost to me in some way. Mr. Thomas Wallace wrote me saying there was five feet standing in the name of L. R. Mills. I once hypothecated this amount of ground to Mills, redeemed it, and always supposed that it had been properly reconveyed. Mills owned of his own right four feet; but some years ago sold his interest to Frank Livingstone; so that if any stock is in Mills's name, there is where my missing shares are. Welton's interest should be in my hands, as he owes me about $1000. The consideration being left blank in the deed, you will please place the proper stamps, and deduct from what is due. Nevada requires the same additional amount as Uncle Sam. I hope you will be able to do something for me, as my finances have been low for several years. Sutro's map of the Comstock was made just before the twenty feet above named was given to Welton and myself, and of course does not appear there. It would have done so, but that it was unknown then. Yours truly, Geo. W. Kinney, Mining Recorder, Eureka District, Nev., Com. for Cal."

At the same time, defendant Heydenfeldt also received a deed from complainant, a copy of which is hereto annexed and marked

"Exhibit A:" "(Rev. Stamp, $1.50, canceled.) (Nevada State Stamp, $1, canceled.) (Nevada State Stamp, 50c., canceled.) This indenture, made the sixth day of April, in the year of our Lord 1872, between Geo. W. Kinney, of Lander county, Nevada, party of the first part, and S. Heydenfeldt, of the city and county of San Francisco, state of California, party of the second part, witnesseth: That the said party of the first part, for and in consideration of the sum of $1200, gold coin of the United States of America, to him in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, has remised, released, and forever quitclaimed, and by these presents, does remise, release, and forever quitclaim unto the said party of the second part, and to his heirs and assigns, all the following described locations, mining rights or claims, located on the Comstock lode, Virginia mining district, Storey county, state of Nevada, to wit: The undivided one-half part of the mine known as the 'Kinney and Welton;' said 'Kinney and Welton' mine consists of twenty and one-tenth $(20^1/_{10})$ feet on the ledge or lode, and adjoins the 'Central No. 2' mine on the south. Also all the interest of said party of the first part in the mine known as the 'Kinney,' (amount unknown); said 'Kinney' mine adjoins the 'White and Murphy' mine on the north, and consists of fifty (50) feet on the ledge or lode; and also an undivided interest in one hundred (100) feet in the mine known as the 'Defiance'; said 'Defiance' mine is situated in the Gold Hill mining district, Storey county aforesaid; was located in the year 1860 by John G. Hatch, Geo. W. Kinney and others, and duly recorded in the records of said Gold Hill mining district. Together with all the dips, spurs and angles, and also all the metals, ores, gold and silver-bearing quartz, rock and earth therein; and all the rights, privileges and franchises thereto incident, appendant and appurtenant, or therewith usually had and enjoyed; and also all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the rents, issues and profits thereof; and also all the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the said party of the first part, of, in, or to the said premises, and every part and parcel thereof, with the appurtenances. To have and to hold, all and singular the said premises, together with the appurtenances and privileges thereto incident, unto the said party of the second part, his heirs and assigns forever. And the party of the first part, for himself and heirs, covenants and agrees with said party of the second part, that said premises are now free from all incumbrances. In witness whereof, the said party of the first part has hereunto set his hand and seal the day and year first above written. (Signed) Geo. W. Kinney. (Seal.) (Duly acknowledged.)"

After receiving the telegram, letters and deeds, the defendant, Heydenfeldt, bargained and sold to the said Flood the ten feet and the one-twentieth of a foot of Kinney and Welton ground, and two feet of Kinney ground, this being all that the abstract of title, hereinbefore mentioned, showed to be vested in the said complainant. Heydenfeldt, by direction of Flood on April 12, 1872, conveyed to the Consolidated Virginia Mining Company in pursuance of the sale. The descriptive part of the deed is as follows: "All the following described locations, mining rights or claim located on the Comstock lode, Virginia mining district, Storey county, state of Nevada, to wit: The undivided one-half part of the mine known as the 'Kinney and Welton.' Said 'Kinney and Welton' mine consists of twenty and one-tenth $(20^1/_{10})$ feet on the ledge or lode, and adjoins the 'Central No. 2' mine on the south. Also all the interest of said party of the first part in the mine known as the 'Kinney' (amount unknown). Said 'Kinney' mine adjoins the 'White and Murphy' mine on the north, and consists of fifty (50) feet on the ledge or lode, together with all dips, spurs and angles, rights, privileges, easements and franchises thereunto belonging, or in anywise appertaining, together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and also all the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the said party of the first part, of, in or to the said premises, and every part and parcel thereof, with the appurtenances." Heydenfeldt informed Kinney of the sale of all his interest by telegraph on April 13, and soon after received in reply a letter, as follows: "Austin, Nevada, April 24, 1872. Hon. S. Heydenfeldt, San Francisco, Cal.—Dear Judge: Your dispatch of the thirteenth, informing me of the sale of all the property named in my deed to you, was received. I hoped to have received a letter from you on the subject, but so far I do not hear from you. Today I have drawn on you in favor of Wallace Everson, agent of New England Mutual Life Insurance Company, for $100 coin. Will also, in a few days, draw for about $210, favor Edwin Robinson, Santa Barbara; and also about $25, favor California Pioneer Society. Will you write and let me know if the five feet standing in the name of L. R. Mills was sold at the same time? Came here yesterday as a witness in the case of Street (Geo. Hearst) v. Lemon M. & M. Co. Hope to get away again to Eureka soon. Yours truly, Geo. W. Kinney." Kinney afterward drew on Heydenfeldt seven several drafts of various amounts for the purchase money which were paid; one of date April 13, one of May 6, two of May 15, two of May 17, and one of May 18. More

than two years thereafter elapsed before Kinney indicated to Heydenfeldt any dissatisfaction with the transaction. During the intermediate time the great bonanza had been developed in the Consolidated Virginia mine.

On December 10, 1874, the complainant Kinney filed his bill in this case which was afterward amended. In the amended bill he alleged that on the sixth day of April, 1872, he was the owner of certain mining ground described as follows: "(1) The undivided ten feet and one-twentieth of one foot of ground on the Comstock ledge, so called, and in that portion thereof described as the northerly twenty feet and one-tenth of a foot of a certain mining location made on the twenty-first day of September, 1859, by plaintiff in his own name and for his own use, in Virginia mining district, whereby he located sixty feet in extent of said ledge, commencing five hundred and fifty feet southerly from the southerly line of Comstock's claims, now known as the Ophir Silver Mining Company's ground—said premises being now known as the Kinney and Welton ground. (2) An undivided interest of twenty-two sixtieths in all that portion of said Comstock lode, thirty-nine feet and nine-tenths of a foot in extent, lying directly south of the parcel of ground last above described. (3) The undivided five feet and one-twentieth of a foot in the portion of said Comstock lode, ten feet and one-tenth of a foot in extent, lying directly south of the last mentioned portion of said lode; said second and third parcels being known as the Kinney ground."

That he applied to defendant, Heydenfeldt, to sell the same, which Heydenfeldt undertook to do; that to facilitate the transaction he executed to Heydenfeldt the deed hereinbefore set out; that the deed was executed for the purpose of enabling Heydenfeldt to sell and convey two feet undivided in the Kinney ground; and was delivered with written instructions to sell said two feet undivided in the Kinney ground; that Heydenfeldt sold to defendant Flood said two undivided feet at $600 per foot; that in pursuance of such sale, Heydenfeldt conveyed to the defendant, the Consolidated Virginia Mining Company, by said deed hereinbefore set out "intending by such conveyance and said company intending to acquire only two feet undivided in said Kinney ground;" that by said deed an apparent title was conveyed to all the interest of complainant; that said conveyance was made to include such property by mistake on the part of Heydenfeldt. A subsequent conveyance to the California Mining Company is alleged, and that both of said mining companies took with notice of the mistake. The property conveyed by mistake is alleged to be worth upwards of $950,000. It is also alleged that the said two mining companies, defendants, have taken out of said mining ground so owned by complainant, and converted to their own use, ores of the value of more than $20,000,000. He asks

that he may be decreed to be the owner of the interests before mentioned in said divisions one, two and three, set out; that the mistake be corrected, and the interest reconveyed by said defendants; and for an account of the ores removed.

The answers admit the making of the conveyances set out; deny the mistake; allege the sale of what Heydenfeldt was authorized to sell, and no more; that it was intentionally done, and that the sale was for full value; that the sale was made for two feet in the Kinney and ten and one-twentieth in the Kinney and Welton; that Kinney was informed of the sale of all, and afterward received the purchase-money without objection. Upon the coming in of the answers, and at the hearing, a part of the claim set up in the bill was abandoned by complainant, and it was admitted that the ten and one-twentieth feet on the north end of the claim, called in the deed and bill the Kinney and Welton ground, and two feet undivided in the ground described in the said deed of Kinney thus: The "Kinney mine adjoins the White and Murphy mine on the north, and consists of fifty (50) feet on the ledge or lode," it being now claimed to be the fifty feet next south of the Kinney and Welton, shown in the accompanying diagram, and drawn on the diagram upon the "Mason or Defendants' Base" was properly conveyed. Upon this admission, there were only left for contest under the allegations of the bill the portions described in divisions two and three, before set out, to wit, the undivided twenty-two-sixtieths of thirty-nine and nine-tenths feet, lying next adjoining south of the said Kinney and Welton, as laid down on said diagram on Mason's base; and the undivided five and one-twentieth feet of the ten and one-tenth feet lying next south of the last abovenamed piece, on the same base, the said ten and one-tenth feet being the south ten and one-tenth feet of the fifty feet described in Kinney's said deed to Heydenfeldt as the "Kinney Mine." The aggregate of said ten and one-tenth feet, thirty-nine and nine-tenths feet, and ten and one-tenth feet, though differently divided, constitutes the twenty and one-tenth feet of the Kinney and Welton ground, and the fifty feet of the Kinney mine, as the same are described in the said deed from Kinney to Heydenfeldt, making in all seventy and one-tenth feet. On June 10, 1859, Penrod & Co., since called Comstock & Co., of whom Comstock was one, while working on a claim made by them, discovered the Comstock lode. Before that time a number of claims had been taken up in the vicinity as square locations. On June 11, 1859, the following mining laws were adopted by the miners of Gold Hill district, which, at that time, embraced the Comstock lode:

"Article 1. There shall be elected one justice of the peace, one constable, and one recorder of this district, for the term of six months."

(Articles 2 and 3 define duties of justice of the peace and constable.)

"Art. 4. The duty of the recorder shall be to keep in a well-bound book, a record of all mining claims that may be presented for record, with the names of the parties locating or purchasing; the number of feet, where situated, and the date of location or purchase; also, return a certificate for said claim or claims."

(Sections 1, 2, 3, 4, 5, and 6 relate to the administration of civil and criminal law.)

"Sec. 7. Evidence of record of claims shall be considered title in preference to claims that are not recorded, nor shall the recorder record more than one hill, dry gulch or ravine claim, in the name of an individual, unless the same has been purchased.

"Sec. 8. All claims shall be properly defined by a stake at each end of the claim, with the number of members forming said company, and the number of feet owned.

"Sec. 9. All claims shall be worked, or the notice renewed in sixty days from the date of record, and no claim shall exceed two hundred feet square, hill claims excepted, which may be reduced to fifty feet front.

"Sec. 10. The recorder shall be allowed the sum of twenty-five cents for recording the claim of each individual or member of a company.

"Sec. 11. No Chinaman shall be allowed to hold a claim in this district.

"Sec. 12. This district shall include all the territory from the meridian of John Town to Steamboat Valley.

"Sec. 13. All quartz claims shall not exceed three hundred feet in length, including the depths and spurs.

"Sec. 14. Any person or persons discovering a quartz vein shall be entitled to an extra claim on all veins he or they may discover.

"Sec. 15. All persons holding quartz claims shall actually work to the amount of $15 to the share, within ninety days from the time of locating.

"Sec. 16. All persons holding quartz claims and complying with section 15, shall hold the same for the term of eighteen months as actual property.

"Sec. 17. All quartz claims shall be duly recorded within thirty days from the time of locating.

"Sec. 18. No person shall locate more than one claim on a vein discovered.

"Sec. 19. Any and all persons locating for mining purposes shall have the same duly recorded within ten days from the time of locating.

"Sec. 20. Resolved, that the above rules and regulations shall be signed by the citizens of this district, and all who may locate hereafter.

"J. A. Osborn was duly elected justice of the peace; Jas. F. Rogers, constable; V. A. Houseworth, recorder.

"A. G. Hammack, Chairman.
"V. A. Houseworth, Secretary."

On September 14, 1859, the miners of Virginia district, embracing, at that time, the Comstock lode, adopted the following laws:

"Mining Laws of Virginia District.

"At a meeting of the miners of Virginia district, held at Virginia City, September 14, 1859, the following laws were adopted for the government of the miners of said district:

"Article 1. All quartz claims hereafter located shall be two hundred feet on the lead, including all its dips and angles.

"Art. 2. All discoverers of new quartz veins shall be entitled to an additional claim for discovery.

"Art. 3. All claims shall be designated by stakes and notices at each corner.

"Art. 4. All quartz claims shall be worked to the amount of $10, or three days' work per month to each claim, and the owner can work to the amount of $40 as soon after the location of the claim as he may elect, which amount being worked, shall exempt him from working on said claim for six months thereafter.

"Art. 5. All quartz claims shall be designated and known by a name and in sections.

"Art. 6. All claims shall be properly recorded within ten days from the time of location.

"Art. 7. All claims recorded in the Gold Hill record and lying in Virginia district, shall be recorded free of charge in the record of Virginia district, upon the presentation of a certificate from the recorder of Gold Hill district, certifying that said claims have been duly recorded in said district; and said claims shall be recorded within thirty days after the passage of this article."

(Article 8 stricken out by the meeting.)

"Art. 9. Surface and hill claims shall be one hundred feet square, and be designated by stakes and notices at each corner.

"Art. 10. All ravine and gulch claims shall be one hundred feet in length, and in width extend from bank to bank, and be designated by a stake and notice at each end.

"Art. 11. All claims shall be worked within ten days after water can be had sufficient to work said claims.

"Art. 12. All ravine, gulch and surface claims shal be recorded within ten days after location.

"Art. 13. All claims not worked according to the laws of this district shall be forfeited, and subject to re-location.

"Art. 14. There shall be a recorder elected, to hold his office for the term of twelve months, who shall be entitled to the sum of fifty cents for each claim located and recorded.

"Art. 15. The recorder shall keep a book with all the laws of this district written therein, which shall at all times be subject to the inspection of the miners of said district, and he is furthermore required to post in two conspicuous places a copy of the laws of said district.

"On motion, it was resolved that these laws be published in the Territorial Enterprise for one month.

"Resolved, that W. C. Campbell be declared the recorder of this district.

"W. C. Campbell, Chairman.
"S. McFadden, Secretary.

"Virginia, September 14, 1859."

Immediately after the discovery of the Comstock lode by Penrod or Comstock & Co., claims were located for a long distance north and south, the claimants taking the south stake of Penrod & Co.'s claim, since called the South Ophir stake, as the point of departure for their measurements, which stake has ever since been the recognized point of departure for the measurement of claims on the Comstock lode. Many, doubtless a majority of those who before had claims located as square locations, re-located their claims as ledge or lode locations under the said new mining laws adopted on June 11. Some others continued to claim, work and hold the ledge within the bounds of their claims under their old locations. Among these prior claimants one, Webb, had a claim purporting to be fifty feet front by four hundred feet deep, lying between two other claims; one on the north, now known as Central No. 2, and the other on the south, now the northern part of the White and Murphy. By whom originally, or in what precise manner located, does not distinctly appear. It seems, however, to have been a claim recognized by the miners of the vicinity.

On September 16, 1859, Webb conveyed to complainant, Kinney, one half of his said claim, by deed drawn by Kinney himself, in the following language:

"Joseph Webb to G. W. Kinney, Sept. 16, 1859.—Know all men by these presents, that I, Joseph Webb, for and in consideration of the sum of $200, paid to me as follows: a note for $150, in my favor, of even tenor and date with this article, payable three months after date, and signed Geo. W. Kinney, and $50 cash, the receipt of which I hereby acknowledge, have this day bargained and sold, and by these presents do bargain and sell to George W. Kinney, all of my right, title and interest in the undivided one-half of a mining claim of quartz, or surface mining, or any mineral the claim may contain. Said mining claim is situated at the town of Ophir, or Virginia City, Nevada territory, and is next adjoining the claim of Briggs, Cord & Co., on the south, and is five hundred and fifty feet distant from the mining claim known as the Comstock & Co. claim. Said mining claim is fifty feet in front, and runs back four hundred feet into the hill, all of which I warrant against any and all claims, the claim of the United States government alone excepted.

"In witness whereof I hereunto affix my hand and seal.

his
"Joseph X Webb. (L. S.)
mark.

"Signed and delivered in the presence of A. H. Hammack, Olive Penrod.

"Ophir, N. T., September 16, 1859."

Two days after, on September 18, 1859, Webb conveyed the other half of his said claim to Jacobs and Weill, under the name of Jacobs & Co., by deed in the following language:

"Joseph Webb to H. Jacobs & Co. Know all men by these presents, that I, Joseph Webb have this eighteenth day of September, 1859, bargained, sold, conveyed and delivered unto H. Jacobs & Co. one undivided half interest in a certain quartz claim, containing fifty feet, situated and adjoining John Bishop on the north line, and the Murphy on the south, for and in the consideration of the sum of $200, paid in hand. Given under my hand and seal this date.

his
"Jos. X Webb.
mark.

"Attest: V. A. Houseworth, Chas. D. Daggett."

Both said deeds were recorded. The said grantees of Webb took possession and worked on said claim in the manner and during the time as more fully stated in the opinion of the court. Whatever interest Jacobs and Weill had has become vested in defendants by various conveyances. And Kinney has made such conveyances as are mentioned in the opinion of the court; the interests so conveyed having also become vested in defendants by various conveyances.

On October 11, 1859, the following notice was recorded in the mining records of the district:

"Claim for Machinery and Right of Way.

"1859, October 11. H. Jacobs and G. W. Kinney claim the ground lying in front of their claims. Commencing five hundred and fifty feet south of the Comstock claims, and running thence southerly along the line of a lead known as the Comstock lead, to the south line of Webb's claim. Said claim of ground for an outlet and machinery was made on the twenty-first day of September, 1859, as per posted notice of that date. William C. Campbell, Recorder."

The testimony as to who caused this notice to be recorded is conflicting. Kinney denies that he had it recorded, while there is other testimony tending strongly to show that he did. The date of the claim, September 21, 1859, is the same as the date at which Kinney claims to have made a quartz claim of sixty feet, yet to be mentioned. At the hearing it was claimed on the part of complainant that Jacobs & Weill's interest was only in a surface location; and that they had no interest whatever in the lode running through their claim; that subsequent to the said conveyances by Webb to Kinney and to Jacobs and Weill, Kinney discovered that there were sixty instead of fifty feet lying between the Central No. 2 and White and Murphy claims; that he located this sixty feet as a lode claim in his own name and for his own use. Upon that ground he claims to have owned the whole sixty feet. In support of this claim

W

Masons or Complainents Base and Course of Lode as Claimed by Complainent.

W & M. SHAFT ▪ KINNEYS & CENTRAL N°2 SHAFT
N. 10° E.

Freeman or Defendants Base and Course of Comstock Lode as Claimed by Defendant.
N. 5° W. S. OPHIR STAKE

933-7 215 ft. 500 ft 210 ft 50 20 50 100 ft 300 ft 150 ft. 200 ft. 100 ft

S.

1280 LEVEL

■ CON. VA. SHAFT

LEVEL

1400 LEVEL

GOULD & CURRY

BEST & BELCHER

SIDES

KINNEY MASON BASE
KINNEY'S WELTON AS SEGREGATED BY SUPPLEMENTAL

PITCH IN JUNE OF KINNEY & "CENTRAL N° 2"

WHITE & MURPHY

KINNEY, FREEMAN OR DEFENDANTS BASE
CENTRAL N° 2

CALIFORNIA

CENTRAL

OPHIR

MEXICAN

Course of end lines of all Claims except Kinneys, at right angles to Freeman's Base.

N.

E.

Kinney testified that he made such a location on September 21, 1859, by putting up stakes on each side, and a notice, the substance of which he recorded for the first time some four years afterward. One or two other witnesses testified that they saw on a stake what purported to be a notice of Kinney, but they could not remember its contents. Jacobs and Weill both testified that, although often on their claim, they never saw or heard of any such notice, and never heard that Kinney claimed sixty feet for himself alone or that he ever denied their right to one half of the fifty feet—that they never saw or heard of any notice of Kinney's except the machinery notice before set out. They admit that he claimed ten additional feet and wanted them to purchase half of that ten feet, but they declined and denied the existence of an additional ten feet. Other witnesses who were in a position to be likely to have seen Kinney's notice testify that they never saw it. And no witness except his attorney in a former suit testified to having heard of his claim to the whole. Kinney made no record of his notice at the time, but about four years after that, on July 18, 1864, Kinney had recorded in the mining records of the district the following:

"I claim and own sixty feet of this gold and silver bearing quartz lead, known as the Comstock lead, with all its dips, spurs and angles, commencing five hundred and fifty feet south from the claims of Comstock & Co., and running southward. George W. Kinney. Virginia City, Sept. 21, 1859."

"Territory of Nevada, County of Storey, ss: This affiant, being first duly sworn, on his oath says, that on the twenty-first day of September, in the year 1859, he located sixty (60) feet of the gold and silver-bearing quartz lode, known as the Comstock lead, situated in what was then known as the Virginia mining district, Carson county, Utah territory; that he posted a notice on the mining ground, so as aforesaid located, which notice remained on the ground for several months, until destroyed by the rain and snow of the spring months of 1860, and that the accompanying writing is, in substance, a true copy of the aforesaid notice, and was made during the summer of the said year, 1860. George W. Kinney. Subscribed and sworn to before me, July 18, 1864. (Seal.) Geo. E. Brickett, Notary Public, Storey Co., U. T. (R. S., 5 cents.)

Subsequently one Welton became interested with Kinney in this mine, and upon remeasuring, he claimed to have ascertained that there were eleven feet more than sixty feet between the Central No. 2 and White and Murphy ground, and upon his suggestion, one Booth, on January 3, 1863, claimed this additional amount, which turned out to be ten and one-tenth feet. He put up and recorded a notice which is as follows: "To all whom it may concern: You will please take notice that I, the undersigned, claim

eleven (11) feet of the gold and silver-bearing quartz lode, known as the Comstock ledge, including all dips, spurs and angles belonging to the same, situated in this mining district, and between the ground of the White and Murphy Co., and the sixty (60) feet owned by the Kinney Co. Said eleven feet runs nearly north and south, or along the line of said lode, and is in width, or east and west, about three hundred (300) feet, or about one hundred and fifty feet each side of the center of Stuart street. George A. Booth. Virginia City, January 3, 1863. Filed and recorded January 3, 1863. Chas. H. Fish, Recorder."

On the next day, January 4, 1863, Booth conveyed to Welton, without receiving any consideration, and afterward Welton conveyed one-half of said ten and one-tenth feet to Kinney. The fifty feet as the amount was originally supposed to be, the additional ten feet discovered and claimed by Kinney, and the further ten and one-tenth feet discovered by Welton, and claimed by Booth, making seventy and one-tenth feet. The difference in the amount depends upon the base adopted for the measurements, the end lines of mining claims on quartz lodes being drawn at right angles to the general course or strike of the lode. Taking the Freeman or defendants' base in the accompanying diagram (being the base of a right angled triangle formed by said line drawn from the South Ophir stake southward, the Mason or complainant's base drawn from the same point southward and westward, and the easterly line of the White and Murphy claim), as the course or strike of the lode, and measuring southward from said South Ophir stake on the said base of the triangle, there are but fifty feet between the Central No. 2 and White and Murphy claims, as claimed by defendants. But if the measurement from the same point is made on the hypothenuse of the triangle, or Mason base, there are seventy and one-tenth feet, as claimed by complainants. The complainants claimed at the hearing that the measurements should be made on the Mason base. Defendants claimed that they should be made on the Freeman base. Complainants further claimed that Kinney owned all except the half of the Booth claim of ten and one-tenth feet; that Jacobs and Weill owned none; and that all the conveyances made by Kinney should be charged to the north sixty feet as measured on the Mason base, and not to the whole seventy and one-tenth feet. These claims were controverted by defendants. On December 1, 1863, which was nearly a year after the said location of the Booth claim, a suit was commenced by Kinney's direction alone, in the name of himself, his several grantees and Jacobs and Weill, against the Central Company No. 2. The following being a copy of the complaint in the action, which was duly verified by Kinney:

"Territory of Nevada, County of Storey. In District Court, First Judicial District.

"G. W. Kinney, E. W. Welton, J. M. Douglass, L. R. Mills, S. W. Dick, M. K. Truett, M. A. Wayman, Doc Wayman, H. Jacobs, Sol. Wiell, and R. Meacham, Plaintiffs, v. The Central No. 2 Gold and Silver Mining Company, Defendant.

"Now come the plaintiffs herein, by Barbour & Nougues, their attorneys, and complain of defendant, a corporation duly created, authorized and acting under and by virtue of the laws of the state of California, and for cause of complaint aver the following: That since the sixteenth day of September, A. D. 1859, they have been the owners, and in possession, and are now the owners and in the sole and exclusive possession of the following described mining ground and gold and silver-bearing quartz ledge; with all its dips, spurs and angles, and sufficient of the surface of the ground over and near thereto for its convenient working, situate in Virginia district, county and territory aforesaid, and more particularly described as follows, to wit: Commencing at a point five hundred and fifty (550) feet from the south line or stake of the Ophir Company's claim, on the Comstock lead, and running thence on the line of the said lead sixty (60) feet to the Booth claim, and known as the Kinney ground. Plaintiffs aver, that being so possessed as aforesaid, and in the quiet and peaceable enjoyment thereof, that they are informed and believe, and upon such information and belief charge the same to be true, that the defendant, through its officers and agents, unjustly and unlawfully, and without right, claim, or pretend to claim, some title or interest in and to the north twenty-one feet of said Kinney claim, and that the said wrongful and unlawful claim of defendant casts a cloud upon the title of the plaintiffs thereto, and causes great damages to the title and interest of the said plaintiffs to the above-mentioned and described premises, of sixty feet of said Comstock lead.

"Wherefore, the premises considered, plaintiffs pray that the claim and title of these plaintiffs to the said twenty-one feet of said mining ground may be confirmed by the judgment or decree of this honorable court. That the claim thereto of said defendant, and all persons claiming under it by title accruing subsequently to the commencement of this action, may, by such judgment or decree, be declared null and void, and that these plaintiffs may have and recover of said defendant their costs of this suit. And these plaintiffs further pray for such other relief or further relief, or both, in the premises as they may be entitled to receive.

"Barbour & Nougues,
"Plaintiffs' Attorneys."

On March 9, 1864, this action was dismissed as to J. M. Douglass, Sol. Wiell and H. Jacobs, who were plaintiffs. The suit went on as to the other plaintiffs. Afterward, on April 26, 1865, a judgment was entered in said case by consent of parties, and the judgment roll filed on said day, establishing the line between said parties at the northerly line of said Kinney and Welton ground, as drawn upon the accompanying diagram, at right angles to the Mason or complainant's base, as thereon laid down; and adjudging that the defendants in said action had no right, title or interest in any part of said mine lying to the southward of said line, and that the plaintiff therein had no right, title or interest in any portions of said mine lying to the northward of said line. Afterward, at the next succeeding term of said court, on June 27, 1865, without any further intermediate proceedings in said cause, a further judgment was entered in said cause, as follows, and a judgment roll thereof filed therein:

"G. W. Kinney and others v. Central No. 2 Gold and Silver Mining Company.

"The respective parties appearing in open court, and consenting thereto, it is hereby ordered, adjudged and decreed that the decree heretofore rendered in this case be so amended as to segregate and set apart to the plaintiffs, G. W. Kinney and E. W. Welton, twenty feet and one-tenth of a foot (20.1 feet) lying south of the division line established by said decree between the plaintiffs and defendant, and north of the line, as shown on said map attached to said decree and made a part thereof, running through the shaft marked 'Kinney and Central No. 2 Shaft,' which line runs parallel with the aforesaid division line; and it is further adjudged and decreed that the other plaintiffs have no right, title or interest in said twenty feet and one-tenth of a foot of ground; and that the ground lying south of said last-mentioned line shall remain the property of all the plaintiffs, according to their rights; but this decree shall not affect their rights as between themselves, but only as to the two division lines established by this and the original decree. It is hereby further ordered, adjudged and decreed, that the shaft marked on said map as the 'Kinney and Central No. 2 Shaft,' is the common property of the Kinney Company and the defendant, their respective interests to be determined by a settlement of accounts between the parties, as to the expenditures made by each in the sinking of the shaft. Richard Rising, District Judge." Indorsed: "1044. G. W. Kinney et al. v. Central No. 2 Co. Modified judgment, June 27, 1865."

On May 3, 1875, pending the present action, Kinney conveyed to G. Frank Smith and A. J. Bryant, all the mining ground in the Virginia district, especially mentioning it as "known as the 'Kinney Mine,' and the 'Kinney and Welton Mine,'" but without mentioning the Booth claim. On December 26, 1877, on leave granted, a supplemental bill was filed, alleging the said trans-

fer of interest pendente lite, and asking that Smith and Bryant be made parties; and that the same relief be granted as before prayed. The other facts necessary to explain the points decided are sufficiently stated in the opinion of the court. The evidence, without headings and formal parts, covered over eight hundred closely printed pages.

G. Frank Smith, James T. Boyd, and S. W. Sanderson, for complainant.

C. J. Hillyer, R. S. Mesick, and S. M. Wilson, for defendants.

SAWYER, Circuit Judge (orally). Some time in the spring or summer of 1859, miners at work on the present site of the Comstock lead or lode, took up mining claims. About the tenth or eleventh of June, the Comstock Company struck the lode. Immediately thereafter locations were made, covering the entire lode for a long distance, north and south. Many locations had been made before. Among others which had been made before, was a location—in what way it was made is not very fully disclosed—by a party of the name of Webb, who claimed fifty feet front by four hundred feet deep. Other locations were made immediately after the discovery of the Comstock lode in the Ophir, the claimants commencing their measurements at the south Ophir stake and locating each way, north and south. Some locations overlapped each other. There were some contests about titles among the adjoining owners, in which Webb, who was an adjoining claimant was involved. In the final settlement, Webb's claim, whatever it was, was recognized as holding the lode. It originally purported to be a claim of fifty feet in front by four hundred feet in depth. Many of these locations were made in June, and immediately after the discovery of the lode in the present Ophir mine. Other locations had been made in the same form—square locations. Some of these parties relocated, others worked and continued on under their old locations, claiming and holding the lode thereby.

This Webb claim, down to September, was recognized by the adjoining claimants, notwithstanding the form of its location. There was some dispute between Webb and his adjoining neighbors. Some had overlapped and covered him. His claim, however, was finally recognized. On the sixteenth of September, he conveyed one-half to Kinney, the complainant in this case, and the form of the conveyance is this: "Have this day bargained and sold, and by these presents do bargain and sell, to George W. Kinney all of my right, title and interest in the undivided one half of a mining claim of quartz or surface mining or any mineral the claim may contain. Said mining claim is situated at the town of Ophir, or Virginia City, Nevada territory, and is next adjoining the claim of Briggs, Cord & Co., on the south."

This deed, the testimony shows, was drawn by Kinney himself, and undoubtedly so drawn with the intent to cover everything that the location could be claimed to cover; quartz as well as other minerals, and any mineral that might be found in the lode as well as on the surface.

Two days after that Webb made another conveyance to Jacobs & Company, which consisted of Jacobs and Weill, and the conveyance is in this language: "Know all men by these presents that I, Jos. Webb, have this eighteenth day of September, 1859, bargained, sold, conveyed and delivered unto H. Jacobs & Co., one undivided half interest in a certain quartz claim containing fifty feet, situated and adjoining John Bishop on the north line and the Murphy on the south, for and in consideration of" and so forth.

In this deed he describes it as a quartz claim. Kinney, in drawing his own conveyance, not only uses the term "quartz" but the term "mineral," doubtless, with intent to cover everything that could be claimed, so that it could be construed as covering a quartz claim. Whatever claim Webb had at this time was recognized by his neighbors, although some had located over him, on the ground that he had not located for a quartz claim; but afterward they recognized his claim. Although the claim is here called "fifty" feet, it is described as extending from Bishop (afterward Central No. 2.) on the north to the Murphy claim on the south.

Immediately after these conveyances made on the sixteenth and eighteenth of September, and more than three months after the Comstock lode had been discovered, and after the said lode had been all located as quartz claims, Kinney commenced a cut in this claim, and the testimony shows—and it is uncontradicted except by Kinney—that Jacobs paid him one-half of the money at the rate of $5 per day for the work. Afterward, Jacobs became dissatisfied with the amount of work that was done, and concluded to put a man in to work his share. He accordingly hired a man by the name of Brophy, and paid him $75 per month, and furnished him with provisions to go and work with Kinney. After working the cut for a while, they started a tunnel. The testimony is uncontradicted as to that. The testimony of Jacobs shows it; the testimony of Weill shows it; the testimony of Brophy shows it; the testimony of several of the complainants' witnesses shows it; and Kinney does not deny the fact of his working there. They commenced running a tunnel, ran in a considerable distance, and worked there until driven out by the snows and rains in the winter, some time in December. Jacobs and Weill paid Brophy, and Kinney worked himself in person. Jacobs and Weill complained even then that Kinney did not do half the work; that he was away a great deal, and did not work all the time. Afterward, an arrangement was made with the White and Murphy Company on the south, by which a shaft was to be sunk for the pur-

pose of prospecting the lead for the benefit of both claims. They claimed a quartz lead. Jacobs and Weill had also an interest in that claim. An arrangement was made by which they were to jointly sink a shaft on the White and Murphy ground, for the purpose of prospecting this lead, and the agreement was to divide expenses between the White and Murphy and Kinney ground, as the Webb claim was then called. Jacobs and Weill were to pay on twenty-five feet in the Kinney, and nineteen feet and a fraction in the White and Murphy. Kinney also paid on his portion of the Kinney ground. That shaft was sunk for a considerable distance, and they worked at it along through 1860 and into 1861. That Jacobs and Weill paid their share is clear from the testimony. In fact it is uncontradicted, and there are contemporaneous bills introduced showing the fact, and showing the proportion which they paid, to be twenty-five feet in the Kinney, and nineteen and a fraction in the White and Murphy. There is one bill of Kinney's, also, which seems to have been made out in 1861, and about the close of their arrangements on that tunnel.

It was further testified by some of the witnesses—Skae, for instance—that Kinney paid on the twenty-five feet only. It was insisted, on the other side, that he paid on a larger amount. Kinney had claimed ten feet more, which he claimed to have found there. That one bill does indicate that he paid on thirty-five feet. The bill was made out by the White and Murphy Company to Kinney. Skae says it was, doubtless, because he claimed he had thirty-five feet, and it was made out in accordance with his wish and request. There is nothing to show whether the amount of that bill bears the ratio of thirty-five to twenty-five, or of twenty-five to twenty-five. He therefore only paid on thirty-five feet at most, while on his present theory he should have paid on sixty feet. Jacobs and Weill paid on the remaining twenty-five feet. These facts, then, clearly stand out; that there was an arrangement by which Jacobs and Weill paid on twenty-five feet, and Kinney paid on the remaining twenty-five feet, and perhaps ten feet more. The whole of the other testimony, except his own, shows that Kinney only paid on twenty-five; but that one bill indicates that he paid on thirty-five, which would be one-half of the fifty feet, and the ten feet which he claims to have found and located outside of the fifty feet. There is that recognition from the beginning down so far, by Kinney, of the rights of Jacobs and Weill.

Coming down a little further, in the year 1862, another arrangement was made with the Central No. 2, by which the parties sunk a joint shaft also; and the agreement established by the testimony was, as I think, that this shaft should be sunk on the line between the Central No. 2 and the Kinney—one-half being on the Kinney side, and the other half on Central No. 2 side. They worked on un-

til late in the year 1862 on that shaft and under that agreement. The agreement was to sink one hundred and fifty feet, in the ratio of one hundred feet to Central No. 2 —the amount in that claim—and fifty feet to the Kinney Company, but they sunk more than that before they got through. There were drifts, also, from that shaft into the Kinney, and other drifts in other directions. The testimony of Jacobs and Weill is, that they entered into that arrangement and paid their share of the assessments, being on twenty-five feet. Kinney, in the meantime, had sold out portions of his ground; but Kinney and his associates paid on the remainder of the claim. There is quite a large number of contemporaneous receipts for moneys paid by Jacobs and Weill on this work. Receipt after receipt was introduced in evidence—contemporaneous receipts— which support the testimony of Jacobs and Weill, and others, in that matter. Those receipts are for money for assessments due on the Kinney ground, and signed "G. W. Kinney," "George W. Kinney" and "Geo. W. Kinney," secretary, purporting on their face to be for money for assessments upon the Kinney ground. That shaft was sunk for the purpose of developing the lead by the two companies. Kinney, in these transactions, purports to act as secretary; to have received the money and receipted for it, as secretary of the Kinney Company. These receipts for assessments continue down to late in 1862; so long, in fact, as there was really substantially any work done on this claim, except what was done by Jacobs and Weill, and somebody other than Kinney subsequently. There is one bill for labor, about which, doubtless, Weill is mistaken—the bill of Lynch. He testified that that was also on the work of the Central No. 2 tunnel. Lynch says he did not work on that tunnel, but in the White and Murphy tunnel, and the bill shows by the date that it is for work done in 1861; so that Weill must be mistaken as to that work being done in Central No. 2. It was, doubtless, for work on the White and Murphy tunnel. Weill and Jacobs testify that they never knew, during this time, that Kinney repudiated their claim. They supposed that they were recognized as owning in company with him. The men who worked on the claim, and some of the complainants' own witnesses, say that they understood that Jacobs and Kinney were in company. Their neighbors so understood it. They sometimes bounded their deeds on the "Jacobs and Kinney claim." Every one seems to have so understood it except Kinney, and there is no testimony except Kinney's—and his contemporaneous acts are against him—that he repudiated at that time the claim of Jacobs and Weill. On the contrary, Jacobs and Weill say that they did not know that Kinney denied their right. In 1863 there was a suit commenced by Wallace against the Kinney Company. In the

meantime, Kinney had made a good many conveyances. That suit was commenced, and the very first defendants named are Weill and Jacobs, and then the various other defendants are named—parties to whom Kinney had, in the meantime, conveyed. The suit is against Sol. Weill, H. Jacobs, Doc. Wayman, Mrs. Wayman, John F. Long, J. M. Douglass, M. K. Truett, Dick, Luther R. Mills and George W. Kinney. The first defendants named in the title of the suit are Weill and Jacobs. In that suit, Wayman, Long, Douglass, Truett, Dick, Mills and Kinney answered by themselves in a joint answer. They contented themselves with denying the title of the complainant. They answered by Barbour and Bryan & Foster as their attorneys.

In the same suit Weill and Jacobs answered separately, by their separate attorneys; they not only deny the title of the complainant, but allege that they are the owners of one undivided twenty-five feet in that ground. They defended in that suit, and they testified that they paid their counsel $2500 at first, as a counsel fee, and that they either paid them $1000 or $1500 subsequently as counsel fee. So they made a vigorous defense. When the suit came to trial, the plaintiff failed to make out his case, and he submitted to a nonsuit. A bill of costs was filed, and Jacobs and Weill's bill of costs is for $285. George W. Kinney's bill of costs, which he signs himself, is $123, so that it seems Jacobs and Weill sustained the brunt of that contest, and paid the larger portion of the expenses, and probably for the reason that Kinney had sold out so much of his twenty-five feet as to leave him with comparatively little interest. Soon after that suit was dismissed, in November, or a month or so, Wallace commenced another suit, and in that suit these several parties answer separately. Kinney answers separately, and in his answer in this suit he only claims five undivided feet. That explains the reason, doubtless, why Jacobs and Weill had the principal labor in this case—that Kinney's share had become small by prior sales. Now, the first answer Kinney verified himself in person. This answer is not verified. It is simply signed by his attorney; and it is said that this claim of only five feet is not an admission by him of the amount of his claim at that time, because he was not present, but his attorney, in his absence, put in this answer.

The summons was served on Kinney on November 20, and four days afterward, on November 24, his answer was filed; and he was there again very soon afterward, on December 1, when he commenced his own suit, as he verified his complaint on that day. So he must have been in that neighborhood; and it is not at all likely that the answer was put in without his knowing it. At all events, his attorneys were thoroughly conversant with his case, and had examined the records for other cases, as Nougues' testimony shows, and had examined them in relation to his ownership about that time. I merely throw this out as showing that at this late date, and after they had ceased the main work on these claims, Jacobs and Weill were recognized as owners of this claim by those who were suing the Kinney Company; that they appeared and defended, and really took the brunt of the defense on themselves, and Kinney must have been aware of it, as he was a party to the suit, and yet he says Jacobs and Weill never claimed that they had any interest in that lode. They paid a large amount of money for working and defending their claim, running through a period of more than three years. And here I will say, while I think of it, that in the White and Murphy claim the witness, Skae, who seems to have been one of the managing men, was asked by counsel what amount was spent on that tunnel; was the amount about $2000? And he said, "Yes, nearer $10,000." Jacobs and Weill testified that they paid their share of the assessments of Central No. 2 and Kinney companies, amounting to from $1500 to $2000. And, as we have seen, they paid besides large counsel fees and expenses in defending their rights. Immediately after that, on December 1, 1863, also, after this work had been done, and while this second Wallace suit was pending, Kinney himself commenced an action against the Central Co. No. 2, and the plaintiffs therein are George W. Kinney, J. M. Douglass, L. R. Mills, S. W. Dick, M. K. Truett, M. A. Wayman, H. Jacobs, Sol. Weill and R. Meacham; but Kinney was the only man who had anything to do with commencing that suit. Nougues was then connected with Mr. Barbour as a law partner. Nougues, one of the attorneys, testifies that he knew nobody in that suit but Kinney; that Kinney represented Kinney and Welton, who were parties; that he had no interviews with anybody but Kinney, and brought the suit by Kinney's direction alone; that he had no consultation with any of the others; and he says Kinney then claimed that the others had no interest in that portion of the claim in dispute, being the northerly twenty-one feet, and this was a suit for twenty-one feet of the northerly portion of the lode, called the Kinney claim, the Booth claim being then called eleven feet. Nougues says he made them parties because he found they were all interested, as he believed from an examination of the records. He made an abstract of it, which he showed Kinney. He says he had some discussion with Kinney; that Kinney objected to their being made parties, but he insisted on it. Finally, that he consented to dismissing the case as to Douglass, Jacobs and Weill. His recollection was, that he dismissed it as to all of these plaintiffs, except Kinney; but it turned out from an inspection of the order of dismissal, that

it was only as against Douglass, Jacobs and Weill, the other complainants being left in. General Williams testified that this dismissal was on his application, and his clients were Douglass, Jacobs and Weill, and it was his only connection with the suit. He says he gave the notice himself, and a few days after the notice Kinney came to him and remonstrated with him personally, and insisted that it would not injure them, and that his clients should remain parties to the suit; that he declined, and Kinney was very much offended; and that he went in on the day when the motion was to be called up and made his motion, and there being no objection, the dismissal was had as to Jacobs, Douglass and Weill.

Now, I am satisfied on this point, that the recollection of General Williams is correct. I do not impugn the integrity of Mr. Nougues, but his recollection is defective. He testifies from his recollection, that the suit was dismissed by him as against all of them, except Kinney and Welton; that Kinney insisted that it should be dismissed as to all, and he supposed it was dismissed as to all. Now, it is not the fact that the suit was dismissed as to all the others. It was only dismissed as to Jacobs, Weill and Douglass, and these were all at that time General Williams' clients, because he answered for them in the suit commenced by Wallace a short time before. Williams could have no knowledge of it except being there on their behalf, as he had no other connection with the suit, and his recollections are that he went there, and it was dismissed, on his motion, as to his clients, and it was not in fact dismissed as to the others. So I think Nougues' recollection as to this point is mixed up with other matters, and somewhat at fault, and needs correction in this particular, as well as on the point that it was dismissed as to the whole. Williams testified that Kinney was dissatisfied, and came to him and remonstrated with him before he had the suit dismissed as to his clients, and was indignant at him for adhering to his purpose. This was as late as December—later, when this transaction of the dismissal took place. The suit was commenced in December. Soon after that Kinney left Virginia City. Weill testified that he employed a man by the name of Dougherty to sink the shaft twenty feet deeper. He testifies that he had spoken to Kinney about it, and Kinney said "Go ahead," he would pay his share, but he never did pay it. He said Kinney manifested very little interest in it, as though he had but very little interest; and if he had but five feet, he had but very little interest. He said that Douglass paid, or his agent, Jones. paid for him on his part, so that he and Douglass paid all that was paid for the sinking of that shaft, and that was sometime subsequent to, or in, 1863. Kinney says after he went away, he understood that Douglass had done some work there. That would confirm Weill's testimony that Douglass and Weill had been working there during his absence. Weill again testified, and it is uncontradicted, that in 1868 he also entered into a contract with another man by the name of Simpson, by which he was to run a drift some seventy-five feet, and for his compensation, Simpson was to have such quartz as he should take out; and that he did take out quartz and work there in that way. There was no work done by Kinney subsequently to 1863, unless it was done by Judge Barbour. He says he believes Judge Barbour did some work to keep up his claim. Weill's testimony is uncontradicted on that point. Taking his testimony as true, he and Jacobs were working from time to time down to 1868, and did the last work on that claim. Jacobs in the meantime sold out his claim— once sold out his entire interest in twenty-five feet—and sometime after, in 1866, he repurchased it. He must, then, at that time, have had confidence in the title.

Kinney, on the contrary, claims now, that he found by actual measurements, that there were ten feet more than had been supposed and at first claimed; and on the twenty-first of September, 1859, a few days after the purchase by him and Jacobs, that he put up a notice of a claim of sixty feet, measured it off, placed his stake, and stuck his notice upon it, claiming sixty feet. He claims that the work he was doing was on that claim, and that it was a quartz claim; that the work Jacobs and Weill were doing, not denying the fact of the work, was simply on a surface claim; that they were working together in the same tunnel and in the same cut with Kinney, with the White and Murphy, with the Central No. 2; all of whom were developing a quartz claim, except Jacobs and Weill; that Jacobs and Weill were paying their share of assessments in all these workings, and were developing nothing but a surface claim. Weill and Jacobs say that Kinney did claim an additional ten feet, and wanted them to take one-half, and they declined to buy it. They insisted that there were no additional ten feet there, and that they were entitled to all the ground that was between those two adjoining claims. Kinney now insists that he wanted to sell half of the whole sixty feet; but he says Jacobs and Weill declined to buy it, because they had all that they wanted. Now "all they wanted" must have been either the twenty-five feet they were working and paying assessments on during those three years, or else what they had was that nineteen feet in the White and Murphy, or both. They may have referred to both or only to the Kinney ground, if any such remark was made. But they would be most likely to be talking of the claim in which they both owned. Kinney did not record his pretended notice of a claim for sixty feet. His notice was not recorded till within a month or two of four years after he claims to have taken the claim up. The mining laws, if he followed them, required him to record his notice within ten days. He never did record any notice, but

only filed an affidavit stating that he had, on the twenty-first of September, 1859, put up a notice, and stated the substance of what he claimed it to be. This was in 1864, after they had ceased working on the claim, so far as the testimony indicates; that is, doing any substantial work except what was done by Jacobs and Weill. One or two witnesses testified that they saw Kinney's stake, and saw a notice; but no one testified to the contents of that notice except Kinney. What the contents of that notice were, except from Kinney's own testimony, we do not know—whether he claimed it for himself, or for himself and Jacobs and Weill. At all events, Jacobs and Weill were working with him, by employing a man, and sharing the assessments; and though often on the ground, they say they never saw that notice. Kinney recognized them as owners, and collected assessments from them for working the mine, and that is against the theory that he claimed it all for himself. There was a notice for fifty feet in front of this claim for working purposes, filed soon after the purchase by Kinney and Jacobs, bearing date September 21, 1859, the same date that Kinney claims to have taken up his sixty feet, and that purported to claim the ground for working purposes, lying in front of the Jacobs and Kinney claim, and purported to be the notice of Jacobs and Kinney. A record of the notice was made October 11, 1859. The record is as follows: "H. Jacobs and G. W. Kinney claim the ground lying in front of their claims. Commencing five hundred and fifty feet south of the Comstock claim, and running thence southerly along the line of a lead known as the Comstock lead, to the south line of Webb's claim. Said claim of ground, for an outlet and machinery, was made on the twenty-first day of September, 1859, as per posted notice of that day."

Jacobs says he never put that record there. Weill says he never put it there. They both say Kinney told them he did put it there; but Kinney says he did not put it there. Now it may well be that this is the notice that Kinney put up and which others saw, and which time and circumstances have, in Kinney's mind, transferred to a claim now set up of sixty feet on the lode. The same place would be a proper location for a stake and notice for either claim. Jacobs and Weill say they never saw any other.

The following is a resumé of the facts substantially with reference to these claims, as shown by the evidence:

Webb, and, afterward, Kinney and Jacobs & Weill in company, were recognized by all their neighbors as holding that fifty feet of ground. They were recognized by their neighbors in their dealings with them, and by bounding on them in their deeds, by the name of Jacobs and Kinney. They were recognized as the owners in company by their employees. It was generally so understood. Kinney recognized Jacobs and Weill's

ownership by working along with them during the three years, the entire time that those operations were being performed, and by collecting and receipting for assessments for working the mine. Kinney, in the suit which he brought, and to which I have already alluded, dated his title from the sixteenth day of September—the date of Webb's conveyance to him—and alleged that as the date of the inception of his title. Jacobs and Weill, by their employees, worked there as if they understood that they owned twenty-five feet; and Kinney acted as though he so understood it, and recognized them as working on the claim he was himself prospecting. Kinney worked personally some two or three months with Brophy, a man hired and paid by Jacobs and Weill. He received the money paid by them on the assessments levied to pay the expenses of working the claim, and signed the receipts as secretary of the Kinney Company. When anybody else brought a suit against the Kinney Company for the mine, they had no difficulty in bringing Jacobs and Weill in as defendants, and they seemed to take the laboring oar in the defense; and when Kinney himself brought a suit, he made them co-plaintiffs without consulting them, and afterward the suit was dismissed as to them, on motion of their own counsel, because they refused to go on with the proceedings. That this was originally what is called a square location, there is no doubt; and that other claims were located in the same way, worked in the same way, and held as lode claims in the same way, there can be no doubt. That appears from the testimony in the case, and has appeared frequently in other cases on the Comstock. It has become a matter of history—both judicial and general history. I do not know but that the court, under a recent decision of the supreme court, ought to take judicial notice of the general and judicial historical facts of the mode of locations on the Comstock lode. At all events the facts satisfactorily appear from the evidence, without resorting to the generally known historical facts. It is too late at this day to insist that Jacobs and Weill were not the owners of those twenty-five feet. In my judgment, no candid, disinterested, impartial mind, after a thorough examination of the testimony in this case, can entertain any greater doubt that Jacobs and Weill owned twenty-five feet of this claim in question, on the Comstock lode, than that Kinney himself owned any part of that claim. The testimony is just as satisfactory and conclusive, notwithstanding the fact that Kinney now repudiates the claim, that they owned twenty-five feet of that lead, as that Kinney owned any portion of it. I take it as settled by the testimony, beyond any reasonable controversy, that Jacobs and Weill owned twenty-five feet of that lead. Wherever, on a material point, the testimony of Jacobs and Weill differs from that of Kinney, I take the testimony of Jacobs and Weill rather than Kin-

ney's because it is supported by the other testimony, and is in harmony with the general conceded facts, and such as we should expect from the condition of things and the intrinsic probabilities of the case, as developed by the testimony.

Then how does the case stand? I shall consider it on the hypothesis that there are seventy feet and a fraction, as claimed by Kinney, but earnestly disputed by the defendants. The twenty-five feet which Jacobs and Weill had, became vested by subsequent conveyances in the corporation defendants. I shall first discuss this question with reference to Kinney alone, and afterward consider the relations of the other complainants in the case. I shall discuss it now on the theory, too, that there are seventy and a fraction feet; and on the theory that all of the conveyances are valid, and shall hereafter consider the contested conveyances. Kinney first conveyed a foot to Truett; he mortgaged five feet to Douglass; the mortgage was foreclosed, and the five feet purchased in and conveyed to Douglass by the purchaser, under the decree of the court; he conveyed ten feet to Long; he conveyed at one time four feet to Mills, and at another five feet to Mills, and at another time one foot to Mills. That makes a conveyance of twenty-six feet which Kinney made out of what he describes in his conveyances as the Kinney ground. He made other conveyances, but the ground conveyed thereby was reconveyed to Kinney, and requires no further notice. Now, if we concede that there are seventy feet and a fraction, Jacobs and Weill had twenty-five; that left twenty-five out of the fifty to Kinney. If we concede that he took up ten feet more that would give him ten feet additional, making thirty-five feet.

Then there is another claim to which I have not referred. Perhaps I ought to have done so before this time. Welton, who had become Kinney's partner, afterward claimed to have discovered that there were ten feet and a fraction still of vacant ground there, and he procured a man by the name of Booth to locate that ten feet. That ten feet was afterward conveyed by Booth to Welton, and half of it conveyed by him to Kinney. It is ten feet and a tenth, as it is conceded by Kinney, to have turned out to be, according to their measurement, although located as being eleven feet. Adding five and five-hundredths feet—being half of this ten and one-tenth feet—to the thirty-five feet, would give Kinney a total of forty and five-hundredths feet. Deducting the twenty-six feet which he had previously conveyed, leaves fourteen and five-hundredths feet. On March 24, 1863, Kinney conveyed one-half of all the mines he had to Welton. On this calculation, he had at that time fourteen and five-hundredths feet, one-half of which would be seven and twenty-five one-thousandths feet. He afterward, intentionally, as now conceded, conveyed twelve and five-hundredths feet

through Judge Heydenfeldt to the defendants, which would make forty-five and seventy-five thousandths feet in all conveyed by Kinney, being five feet and over more than he ever had. Thus Kinney conveyed five and twenty-five thousandths of a foot more than he ever had, conceding the full claim to be seventy and a fraction feet.

This claim of Booth was located and claimed on the third of January, 1863. Booth testifies in the matter. He testifies that Welton told him there was vacant ground there, and got him to assist him in the measurement, and then wanted him to take up that ten feet, and on this request he did take it up. They measured it together and put down the stakes; took it up and filed the notice; and Welton went with him to the recorder's office, and saw the notice recorded. On the next day he conveyed to Welton. He got nothing for the conveyance, but expected to get something when Welton sold it. Welton afterward conveyed one-half to Kinney. Now Booth says, he paid $30 to Welton for work on that claim. There was no work shown on that claim by any of the testimony, except that $80 paid by Booth, unless it was considered that the work on the Kinney ground was work on the Booth claim, and this transaction of Booth was after all the work was done, unless Barbour did some work, or unless the work of Jacobs and Weill and Douglass can be made to apply. He seems to be the only man who paid anything for work on the Booth claim, and it does not appear that Welton in fact did any work. He says he paid $80 to Welton for work on that claim. Welton does not say he was paid anything, or that he did any work. Booth took the claim up on the third of January, and conveyed it to Welton on the fourth; so that Welton, according to that testimony, must have done $80 worth of work for Booth in the space of twenty-four hours. I place no reliance on that testimony. I do not think there was any work done. I am satisfied there was not. I am satisfied, from the state of the testimony, that this location was not Booth's work at all; it was Welton and Kinney's under another name. What their object was I do not know, unless they might have had some fears, that if taken in their own names, their associates would be entitled to share with them. Welton and Kinney seem to have been partners then. Kinney was not present, and perhaps Kinney did not know of it at the time. It may be called Welton's work, but Welton's and Kinney's interests seem to have been joined at that time, and probably the act of one was the act of the other. But on the hypothesis that the Booth claim is good, and the hypothesis that these deeds are all correct, Kinney conveyed the whole of his interest in this entire ground, and five and a fraction feet over, according to my figures.

There are two ways by which the complainants seek to avoid this result: Firstly,

They claim the whole of this ground, denying the right of Jacobs and Weill to any. This claim must be rejected, and it needs no further comment. The rejection of this claim, and recognition of the right of Jacobs and Weill, should end this case. Kinney repeatedly testified, in substance, that in estimating the amount he owned at the time of his conveyance to Heydenfeldt, and for the purpose of ascertaining his remaining interest to serve as a basis of this action, he acted upon the idea that Jacobs and Weill owned nothing in the mining ground in dispute, and he indicates that if they did own twenty-five feet, then he had no ground of action. It is now conceded, that he intended to convey to Heydenfeldt twelve and a fraction feet. He only alleges in his bill—and he must be limited to his claim in the bill—an ownership of twenty-two sixtieths of thirty-nine and one-tenth feet, being fourteen and sixty-three hundredths feet, and an undivided five and one-twentieths feet, making an aggregate of nineteen and sixty-eight hundredths feet. This is all he claims to own by the allegations of his bill, besides the twelve and a fraction feet, which he now admits was intentionally conveyed to Heydenfeldt; and this claim is based, as he concedes, on the idea that he owned the whole fifty feet of the lode derived through Webb, and that Jacobs and Weill owned none. Since it turns out that Jacobs and Weill did own twenty-five feet, this amount must be deducted from the basis of his claim, and twenty-five feet is five and thirty-two hundredths feet more than the nineteen and sixty-eight hundredths feet alleged in his bill as the amount owned by him, which excess corresponds very nearly with the excess he appears, by his deeds, to have conveyed more than he ever owned. Upon Kinney's own theory, then, as distinctly disclosed in his testimony when compared with the allegations of the bill, if Jacobs and Weill owned twenty-five feet, he has no ground of action; but on the contrary, he really had more than five feet less than he had in some way assumed to dispose of.

Secondly. They claim to avoid the effect of these facts in another mode; they claim that Kinney's conveyances must all be credited to the northern sixty feet; that is what he calls the Kinney ground at that time. The testimony, all except in one particular instance, indicates that Kinney regarded the additional feet as on the south side; there is one point which leaves it in doubt whether he intended the extra ten feet located by Kinney to be on the north or south. But on page 781 of the testimony he locates it on the south. Booth took his up on the south, and Kinney says he took up the whole sixty feet commencing on the north and ending on the south. Which end he now claims the ten feet to be on does not very clearly appear. It would naturally be on the south, as the Ophir stake appears to have been the point from which all measurements were made. I do not know what right he had to select his ground. The other parties, Jacobs and Weill, claimed the whole from claim to claim adjoining—that there were no extra ten feet there. There was a stake on the White and Murphy line and a stake on Central No. 2 line. If it was a case of a deed describing ground as commencing at one stake and running thence fifty feet to another stake, where the deeds fixed the monuments, and it turned out that there were more than fifty feet between the monuments, the whole would be conveyed by the deeds from monument to monument. The deed from Webb to Jacobs & Co. described the claim conveyed as extending from the adjoining claim on the north to the Murphy on the south. The parties were there in possession, from one claim to the other. It is true they called it fifty feet, but there was a stake on either side marking the boundaries of the adjoining claims; and the claim was admitted by outside parties, at a time, too, when people were looking for vacant ground. If Kinney could locate thus and locate his partners out of the ground, I do not know how, or by what authority he could select the place where he would take his ten feet. His associates, certainly, would have something to say about that. At all events, that is the way the claim stands.

Kinney evidently, in all his conveyances, referred to the whole ground as the Kinney ground, but they were made before the Booth location. That is doubtless so; but later, from some time in 1865, it has been assumed by Kinney that there has been a partition or segregation by which twenty and a fraction feet were cut off from the northern end and segregated to Kinney and Welton; and which they have since claimed in severalty, and they have named this segregated twenty and a fraction feet the "Kinney and Welton Claim," and all the rest, including the Booth location, the "Kinney Ground." All except the north twenty and one-tenth feet is called the Kinney ground in the deed in question to Heydenfeldt. Now as to the suit of Kinney v. Central No. 2 Co. Kinney and everybody else, ever since the judgment in that action, appear to have acted upon this assumption. Kinney and Welton claimed the whole of that twenty and a fraction feet. By what means do they get that twenty and a fraction feet in severalty? It must be by a transfer of the Booth claim on the south, and the other ten feet which Kinney claimed to have found and located to the northern end of the claim by some means. The amount corresponds to the amount of those two claims. There is no conveyance shown in evidence, either written or verbal. There is no means indicated in the evidence by which they got that segregated except by an addendum to the judgment in the case which Kinney brought against Central No. 2, in which Douglass, Jacobs and Weill refused to be joined and were dismissed.

After their dismissal, a decree was entered

in that case by which a line was established between the Central No. 2 and the remaining plaintiffs in the case. Some two or three months after that there was a supplemental decree appended to the other after the adjournment of the term, in which it is adjudged and decreed that Kinney and Welton owned that twenty and a fraction feet on the northern end in severalty; that the other plaintiffs had no right therein; and that the remaining portion to the south should remain the property of all the plaintiffs according to their rights. That purports to be a decree by consent. One of the complainants' counsel seems to regard that as a valid decree, and as in evidence and as having some effect; while the other repudiates the validity of that decree. It was objected to by him as evidence on the ground that the supplemental decree is wholly void, and therefore irrelevant. I am inclined to think that it is void as a decree. I take that view of it as a decree of the court. In the first place, there is not an allegation in the complaint upon which the decree could be based; there is no allegation at all on the subject, except that the plaintiffs are owners of the mining ground, and the defendants are not, and seeking to settle the title of the defendants therein. There is no allegation as to the rights of one plaintiff against the others anywhere in the complaint. Nothing is there shown on which the decree could be based. In the second place, Jacobs and Weill and Douglass were not parties to it; they were tenants in common, and had an interest. Their consent was necessary to affect their rights. Another ground, and the main ground that was relied on is, that it was entered after the adjournment for the term; after the rights of the parties had been finally adjudicated; after the case had been closed, and the record finally made up; and that the court was not authorized to make a further decree for want of jurisdiction. If that is so, there is no possible way shown by the evidence by which Kinney and Welton got their interest transferred in severalty to those northern twenty feet, unless this decree, though void as a decree, can be regarded as a partition by consent. It may perhaps be regarded as an admission of the parties to the suit entered on the record by which those who were parties consented to a partition. That decree is the only act Kinney relies on to show a segregation, notwithstanding the fact that he objects to its introduction as invalid. From that time forward he claimed it for himself and Welton in severalty. In his letter to Heydenfeldt he claimed it in severalty, and refers to it as having been obtained by virtue of that decree, for no other is shown, and that his interest remains in the same position as that in which this decree left it; that he had done nothing with it since. He treated this segregated part as belonging to him and Welton. He claimed to own an undivided half of it, and he claimed it by virtue of that

decree. He sold Heydenfeldt ten feet and one-twentieth of a foot in it—in other words, one-half of it. He admits that he sold that amount and got his pay for it in this very transaction which he seeks to have reviewed —the transaction which he seeks to have declared to have been entered into by mistake, which mistake he now asks to have corrected. Welton claimed the other half. He must have got it through that decree as a decree, or by virtue of that stipulation upon the record regarded as an agreement for partition, or as evidence of a prior parol partition, or so far as the testimony is concerned he did not get it at all. It may be looked on perhaps as something in the nature of an agreement for partition between those plaintiffs. It does not appear whether the attorneys or parties in person consented. It might be said to be by consent of the parties. If by consent of the attorney, and he had no authority, Kinney has still recognized it, because he has ever since claimed under it, and there is no other way shown in the testimony by which he and Welton could have got these twenty feet in severalty. Even if he took his own ten extra feet. there on the north, he could not transfer the Booth ten feet to that end of the claim. And subsequently to that time he considered the Booth claim as a part of the Kinney ground, for he describes it as such in the very deed in question. If we consider it as an agreement for partition, or as evidence of a prior parol partition between him, Welton and the other plaintiffs, by which they set off that portion to him, and the others acquiesced, and possession was taken in accordance with this agreement; it also at the same time transferred the right of his prior grantees in the whole to the remaining part. Such would be the effect of the partition, and his deeds of conveyance should be credited to the remaining part. When he took the interest of the others in the north twenty and one-tenth feet by that partition, or by decree, or by whatever means he got it, he must have yielded his right to a corresponding amount in the remaining part to the others in order to make the partition as it should be. The whole southern fifty feet he thenceforth treated as the Kinney ground. Then taken in that view the several conveyances of Kinney should be applied to the other part.

But his present theory goes beyond that even; he now. for the first time, so far as the evidence shows. claims the twenty and a fraction feet on the north, and besides claims half of the ten feet of Booth ground on the south. That would be eighty feet and a fraction instead of seventy, because he got this segregated twenty feet by some sort of partition. Certainly, he has not claimed the ground as eighty feet, and it is only by that process that he can get the ten feet in there in addition to the twenty and one-tenth feet on the north. He must either have transferred that Booth ten feet to the north end,

or else he has not got a title to that twenty and a fraction feet on the north. He then, himself, by his acts, recognized those conveyances as being transferred and passed over to the other portion of his claim, and claimed his several interests in the northern twenty feet. He has acted on that theory ever since. He acted on it in the conveyance in question, to Heydenfeldt. He admits now that it is shown by the conveyance that he did convey, and intended to convey ten and a fraction feet of the Kinney and Welton ground to Heydenfeldt, and got his pay for it. Now, if he did that, and these conveyances are to be credited to the whole northern sixty feet, then he has sold to Heydenfeldt ten and one-twentieth feet which he did not own, or at least a large portion of it. If there has been no partition in setting that off in severalty, he did not have that ten and a half feet to sell, because, on his present theory, these conveyances affected the whole northern sixty feet. If that is so, he had no ten and a fraction feet to sell in that part, and Heydenfeldt and the Consolidated Virginia and California Companies have a counter-claim for the correction of the mistake in that particular, and a claim to get the ground which they have bought and paid for out of the ground which Kinney did in fact own. It makes very little difference, I apprehend, which way it goes. Somebody is wronged upon that theory—upon the theory that the whole of his conveyances are to be credited to the northern sixty feet, while the whole northern twenty and one-tenth feet are owned by him and Welton in severalty. On that theory, somebody has been wronged, and that somebody is the defendants, because the defendants have bought and paid for the full number of feet that Kinney ever owned in the whole seventy and one-tenth feet, and bought it of Kinney and his grantees. That is shown by the testimony. The testimony shows that they had bought from Kinney and his grantees the full amount of Kinney's portion of seventy and a fraction feet—as much of said lode as Kinney ever owned. So that if anybody is wronged by that claim it is the defendants, and they are wronged by Kinney; and the defendants have a counter-right to a correction of the mistake as against Kinney, so as to get their full number of feet purchased through Kinney, somewhere in these claims.

It is apparent that Kinney and Welton, and Kinney's grantees, who were co-plaintiffs in the Central suit, including the defendants, their successors in interest, who are also the grantees of Jacobs and Weill, have acted, and that Kinney and defendants have acted in this transaction upon the idea that there was a partition made by virtue of the supplemental decree in the Central suit, by which the northern twenty and one-tenth feet were segregated and set off to Kinney and Welton, and the remaining fifty feet constituting the Kinney ground, left to be held in common,

thereby referring Kinney's previous conveyances to that portion. · The parties to the deeds sought to be reformed, Kinney and defendants, acted upon that hypothesis in this very transaction. And it cannot be successfully claimed that Kinney, in adopting this hypothesis, acted under any mistake of fact. In no other way indicated by the evidence could Kinney have ten and a fraction feet in the Kinney and Welton ground to convey to Heydenfeldt. And equity requires that the court should act upon the same hypothesis, as this is the only one upon which defendants can obtain all the interests which they have, in good faith, bought from Kinney and his grantees and paid for; and the only ground upon which full justice can be done between these parties, and upon this hypothesis there is no mistake against Kinney. Upon that ground, then, there is no mistake, in my judgment, which ought to be corrected by a court of equity, and the equities are with the defendants.

The case stands thus: Kinney never had but forty and five one-hundredths feet, allowing and including the ten extra feet claimed to have been located by himself, and half of the ten and one-tenth feet claimed to have been found and located by Booth, the remaining twenty-five feet being owned by Jacobs and Weill. He conveyed forty-five and seventy-five one-thousandths feet, being five and twenty-five one-thousandths feet more than he ever owned. Defendants have purchased and received conveyances from Kinney and his grantees, including in Kinney's direct conveyance only the amount which Kinney admits he intended to convey by the deed in question, forty and five one-thousandths feet, being all he ever owned, five feet from Welton, which would embrace the other half of the Booth claim, and twenty-five feet from Jacobs and Weill, making the whole seventy and five one-thousandths feet.

If Kinney has made a mistake, and conveyed more than he intended in the Kinney ground, he has, also, made a counter-mistake in conveying a corresponding amount more than he owned in the Kinney and Welton, and if he asks equity by correcting one mistake against him, he should do equity by correcting the other in his favor and against the defendants. The legal title and possession are in defendants. The equities, at least, are equal in their favor, if not better, on that hypothesis. Where the equities are equal, the one in possession stands in the better position. On that ground, I think that deed should not be corrected, because, if Kinney has made to defendants conveyances of more than he intended in the south fifty feet, he has conveyed an equal amount more than he owned in the northern twenty feet. That is to say, the court will not reform this instrument for the purpose of giving him those advantages which he claims, if he has fallen into them by mistake. If defendants got no more than they bought and paid for, and

bought and paid for through him, there certainly is no ground for a reformation of the instrument on that theory, even though they did not get it in the precise way contemplated.

We now come to the contested conveyances. There are three contested conveyances; the conveyance from Kinney to Welton of one-half of the ten and a fraction feet claimed to have been located by Booth, executed at the time when it was necessary that the deed should be stamped, and there was no stamp on it. It has not been stamped, and the counsel could not find any authority for stamping it at this time; another one to Mills of one foot, is in the same condition. I think there are two answers to the objections taken. I will take the Kinney deed, because it is larger. There are two answers to the claim of the plaintiff on that point. The first is that the statute provided that where a party received a conveyance that was duly stamped, his right should be in no way affected by any prior conveyance that was not stamped. The statute did not make the instrument absolutely void. It simply meant to put a disability on the use of the instrument as an instrument of evidence as between the parties to it. It made it a penalty for any person to issue or execute an instrument without stamping it, and for the purpose of insuring payment of this stamp tax, it made the instrument inadmissible as evidence, and also provided that its record should not impart notice to subsequent purchasers, but as the law was simply meant to operate on the parties to the transaction who ought to have stamped it, it was provided that a subsequent conveyance to a party by a deed properly stamped, should not be affected by a defect in the prior transfer. That being so these defendants acquired title by subsequent conveyances which were stamped, and in all respects lawful, and which passed the title to them as purchasers unaffected by the want of stamps on previous conveyances, and they have the protection of the statute on that point. But I do not know how the complainant gets over the point, as to his own deed. The prior deed from Booth to Welton was not stamped. It is not necessary to attach any consequence to this defect, and I only refer to it. The deed from Booth to Welton of that ten feet was not stamped, and stands in the same condition as the other. I do not know that there is any law which authorizes the complainants to stamp their deed, which does not authorize the defendants to stamp theirs. It is, however, unnecessary to lay any stress upon that point, but it is the fact that the deed of Booth was not stamped until after this action was commenced, and since this testimony was mostly taken; and it is claimed that there is no law now authorizing it to be stamped; and that there has not been a law authorizing unstamped instruments to be stamped since the first of January, 1877. But that is not a matter of importance to this controversy. On the theory I adopt, if the deed from Welton to Kinney is not stamped, it is Kinney's fault and Welton's fault. They were the parties to it, and conveyances have been made by both those parties since to defendants, and valid conveyances have been made to defendants by the grantees in the unstamped deeds.

Kinney sold his mining ground to parties through whom defendants derive title, and got his consideration for it; if he failed to make a valid conveyance, equity required that he should make a good conveyance. It was his duty to make one, and thereby perfect the title of defendants derived through him by the unstamped deed. It is no more than he ought to do to perfect that deed, and I see no reason why a court of equity would not compel an execution of a valid deed, or the perfecting of the deeds already executed by stamping it, so long as the law permits the stamp to be put on. If so, he has done nothing more than he should have done, and what a court of equity would have compelled him to do. But it is claimed that the deed, which, though executed for another purpose, happens to cure the defects of his prior conveyances, was executed by mistake, and he asks that the mistake may be corrected, and in order to enable him to make out the mistake relied on, he asks the court to permit him to repudiate his former defective conveyances. He comes into court, and asks affirmative relief on this ground. A man who comes into a court of equity asking equity, must do equity, and equity would require him to perfect that title, and will not correct a mistake for the purpose of allowing him to avail himself of his own wrong in failing to stamp that deed, and in declining to give effect to the sale which he made, and for which he received his consideration.

The same observations will apply to the Mills deed. I will not go over the point again, but will only say that Kinney is not entitled to a decree to reform his deed, for the purpose of enabling him to take advantage of his own wrong in neglecting to stamp a former conveyance under which the defendants in part claimed title. On both of these grounds, therefore, the objection to allowing the Welton and the Mills deeds must be overruled.

The next is the Long deed. The Long deed is a deed of ten feet, executed in 1861. That deed was executed, witnessed and acknowledged, but was not recorded. It is unnecessary to discuss the validity of this deed with reference to Kinney. The complainants do not even claim that the deed is not good as against him, except under a statute of Utah, which I have held heretofore, and which I shall continue to hold until overruled, did not apply to mining claims. They have not made a very earnest stand on that point as to Kinney, and unless void by the statute, they admit that the deed as to Kinney was valid, but deny its validity with reference to the

other two complainants, who have acquired their interests since the commencement of this suit. They do claim, however, that it was given only in trust.

I may as well go over this part of the case in this connection, now I have it in my mind. This deed was executed some time in October, 1861. Kinney says that it was not intended for a conveyance—that he only put it in Long's name to avoid his creditors, and that Long so understood it. He did not record it. He did not even acknowledge it until several months after it was given, but even then, the deed was not recorded so as to make it a protection. That is the only ground on which he puts the question as to that deed. He says, however, that he had ample property besides left, out of which the judgment which he was seeking to avoid—a judgment for some two hundred dollars from Placerville—could have been collected. That his other interest in the same claims was ample to pay that. This conveyance, therefore, was needless, for it would not accomplish his purpose, if that was his purpose, as he had an abundance of property left to satisfy this demand. A portion of the same mining claim was left amply sufficient to satisfy this demand. Besides, he acknowledged it several months after it was given, showing that he intended at that date to give it effect. Upon this theory it was given for a fraudulent purpose, and passed the legal title. In such cases a court of equity will, doubtless, leave him where it finds him. The pretense seems to be preposterous on that state of facts, but in addition to that, Long immediately sold five feet to Douglass and five feet to Mrs. Ormsby, afterwards Mrs. Wayman; their deeds were on record, and they were recognized afterward by Kinney as members of the Kinney Company. It was a fact that must have been notorious, and well known to him, because when Wallace brought the first suit against the Kinney Company to recover this ground, he made Long. Douglass and Mrs. Wayman parties, and afterward, in the second suit, he made Douglass and Mrs. Wayman, as well as Kinney parties. It must have been notorious, for when the parties desired to sue the Kinney Company, they had no difficulty in finding out who owned the ground. Douglass, Mrs. Wayman and Kinney were defendants in the same suit. Kinney filed an answer, for himself, Douglass. Mrs. Wayman et al., and verified it, and in the verification he stated that he had read the answer and knew its contents. He must have known, therefore, that Long and Douglass and Mrs. Wayman, were parties to it. Not only did he know it, but others desiring to deal with the company knew it.

The suit was Wallace v. Sol. Weill, H. Jacobs, J. W. Wayman, John F. Long, J. M. Douglass [unreported]. And now come the above defendants, J. W. Wayman, Wayman, Long, Douglass, Truett, Dick, Miles, George

W. Kinney, and answer all in one answer. Kinney verifies it. He being "one of the defendants above named, being duly sworn deposes and says: That he has heard the foregoing answer read, and knows the contents thereof, and that the same is true of his own knowledge, except as to such matters as are therein stated on his information and belief, and as to those matters he believes it to be true." It is signed George W. Kinney. They were, therefore, parties to the same suit, and he answers for them all, and says he has read the answer, and knows what it contains, and has verified it. There are no other means shown by which Mrs. Wayman and Douglass as to a part obtained any title, except through that deed to Long. Kinney knew, then, that Long had conveyed it to Douglass and Mrs. Wayman. What is more, in the same suit, before they came to the trial, there was a stipulation filed by which Long's right was to be protected, and another stipulation in the case is that the interest of Douglass is to be protected, and that the interest so to be protected came from Long; and Long is not shown to have had any other right than that which came from Kinney. There is a recognition of these rights again by Kinney, when Kinney brought his suit against Central No. 2. In that suit he made Douglass and Mrs. Wayman parties as co-plaintiffs, thereby recognizing their rights subsequently to this Wallace suit. There is no ground, therefore, for rejecting that deed, because it was not intended for a conveyance. But if it was intended for the purpose now claimed, it passed the legal estate, and being for a fraudulent and unlawful purpose, a court of equity will leave him where it finds him. It passed a legal title, and that legal title has in part, at least. been conveyed to these defendants, and it does not appear that they had notice of the purpose now alleged by Kinney. I have myself, however, no doubt from the evidence, that the deed was intended by Kinney to vest a good title in Long. There is no ground, therefore, for rejecting the Long deed in order to work out a mistake for the benefit of Kinney.

Again, on this ground of mistake, I do not see anything in the evidence which indicates that Kinney ever, till recently, claimed the whole of that sixty feet as against his co-defendants. His testimony is the only testimony, except one passage in Nougues' evidence, that indicates it anywhere, and Kinney's testimony is denied by Jacobs and Weill, and the other undisputed facts, and circumstances confirm and corroborate the latter. Jacobs and Weill say he did want them to buy half of the extra ten feet, which he claimed to have located, but which they refused to do, on the ground that there were no ten feet there. Weill says Kinney insisted on his disclaiming any interest in the ten feet, and he did so, on the theory, however, of which Kinney was aware, that there were no extra ten feet to disclaim, and that that

was about the time of the suit against Central No. 2. It is very clear that up to that time Kinney recognized Jacobs and Weill as co-owners in that mine to the extent of twenty-five feet, and collected numerous assessments from them on the twenty-five feet, for expenses of working and developing the Kinney mine, giving receipts therefor, signed "Geo. W. Kinney, Secretary." In this transaction with Heydenfeldt, Kinney evidently goes on that same theory. He did not, then, pretend in his letter to Heydenfeldt, that he had more than five feet, besides the twelve and a fraction. He says there should be five feet more somewhere—where, he did not know—but he supposed it was in Mills, because he had conveyed to Mills five feet once, as security for a debt. He presumed it had never been reconveyed. It turns out that it had been reconveyed, as the evidence shows, so he was mistaken as to that proposition, and, therefore, there probably his mistake lay. He supposed he still had five feet which was in Mills, but now when he conveyed to Heydenfeldt, he only claimed that there were ten and a half feet in the Kinney and Welton, two feet in the Kinney. and he supposed there must be five feet somewhere, but did not know where it was. That is all he claimed; all he made any pretense to. If he did not, in that transaction with Heydenfeldt, recognize the title of Jacobs and Weill to twenty-five feet, and his defective conveyances as valid, he should have claimed some thirty-five feet, which his counsel now claim for him in this action (although no such amount is alleged in the bill), instead of the ten and one-half feet, the two feet, and the five feet which he thought he ought to have, but did not know where to look for, because the conveyances do not indicate where the title is, unless he recognized that twenty-five feet in them. He manifestly dealt with Heydenfeldt on the theory that Jacobs and Weill and their grantees owned twenty-five feet, and the fact is that they did own it. He undoubtedly recognized that fact at that time. Now, then, if he contemplated that state of facts when he made his deed to Heydenfeldt, he cannot now go back and say there is a mistake; they did not own it; I owned it all. when the fact is he did not own it at all. That cannot be made the basis of a mistake for the purpose of correcting this conveyance. He himself evidently treated those parties as being owners of the twenty-five feet, otherwise his claim was not such as it ought to have been, and doubtless would have been. Mr. Kinney is an intelligent man. A man who understands what he is about. That is manifest from his testimony. He was in the habit of drawing his own deeds, and with technical accuracy. He knew what conveyances he had made. We are not to suppose he was not aware of all the conveyances he had made. He does not pretend that he had forgotten any of his conveyances. He does not pretend that he did not know he had made all these various conveyances introduced in evidence here. He made no mistake, then, as to what conveyances he had executed. If he made any mistake, it evidently was as to the effect of that record, which he at that time claimed to be a judgment; and if he made a mistake in that particular, it is a mistake of law, and not a mistake of fact. He could have made no mistake of fact with reference to the amount he had conveyed, or with reference to Jacobs and Weill's owning twenty-five feet of the lode. At the time of the conveyance to Heydenfeldt, also, it is equally manifest, from similar considerations, that he had not conceived the idea of repudiating the Kinney, Mills and Long deeds; and that he recognized the validity of those conveyances, and made his calculation of the amount owned by him on that basis. There was no mistake here, then. This being so, there is nothing left for him upon which to base an equity to sustain a bill for rectifying a mistake.

There is another question which has been very earnestly contested here, and that is as to whether there were any extra feet which Kinney could locate. One side claimed that there were twenty feet and one-tenth extra, and the other side claimed that there were no extra feet. The solution of this question depends on the base line of the lode to be adopted for the measurement. In order to get the ten or twenty extra feet, the base line adopted by Kinney runs higher up the mountain and further towards the west, so far that by making the hypothenuse of a right angle triangle the base upon which to measure, a greater distance is obtained than by adopting the base of the triangle for the line of measurement, as claimed by the defendants. By taking the Kinney base and the survey made by Mason, for the purpose of his suit with Central No. 2. there are seventy and one-tenth feet. Take the Freeman base, the base claimed to be the true base in the direction of the lode, as claimed by the defendants, and there are left but fifty feet. That is the way the additional twenty feet are claimed to have been found. There is a good deal of testimony on the subject as to which is the proper base. It is insisted on the part of the complainants, however, that the proposition that there are seventy feet and a fraction, is admitted, and is therefore not open to question. They manifestly misconstrue the pleadings. They first claim: "(1) The undivided ten feet and one-twentieth of one foot of ground on the Comstock ledge, so-called. and in that portion thereof described as the northerly twenty feet and one tenth of a foot of a certain mining location made on the twenty-first day of September, 1859, by plaintiff in his own name and for his own use, in Virginia mining district, whereby he located sixty feet in extent of said ledge, commencing five hundred and fifty feet southerly from the southerly line of Comstock's claims, now known as the 'Ophir Silver Mining Com-

pany's Ground'—said premises · being now known as the 'Kinney and Welton Ground.' (2) An undivided interest of twenty-two sixtieths in all that portion of said Comstock lode, thirty-nine and nine-tenths of a foot in extent, lying directly south of the parcel of ground last above described. (3) The undivided five feet and one-twentieth of a foot in the portion of said Comstock lode directly south of the last-mentioned portion of said lode. Said second and third parcels being known as the 'Kinney Ground.' "

Now, these second and third propositions are denied in the answer. The only allegation upon which complainants base this claim is the following, and that is not an allegation. that there were seventy and a fraction feet there to be located. It is only an allegation of what the deed to Heydenfeldt contains—what it purports to contain. That is not an issuable allegation as to the quantity of ground to be found there. The allegation reads thus: "Whereby he conveyed away to the said defendant, Heydenfeldt, certain premises described in such conveyances as follows." Then he goes on to describe it, copying the description contained in the deed: "All the following described locations, mining rights or claims, located on the Comstock lode, Virginia mining district, Storey county, state of Nevada, to wit: The undivided one half part of the mine known as the 'Kinney and Welton'; said Kinney and Welton mine consists of twenty and one-tenth feet on the ledge or lode, and adjoins the Central No. 2 mine on the south; also, all the interest of said party of the first part in the mine known as the 'Kinney' (amount unknown); said Kinney mine adjoins the White and Murphy mine on the north, and consists of fifty feet on the ledge or lode, and also an undivided interest of one hundred feet, in the mine known as 'Defiance' "—and so forth. That is simply an allegation of what that deed contains; it is not an allegation that that amount of land in fact was there. There is no direct issuable allegation as to what amount of ground was there. The defendants could not deny that allegation because the deed did contain that description; they only made the allegation to show what the deed purported to convey. Defendants admit that the deed did contain the description alleged. and could not truthfully do otherwise. It is true we may infer that there were seventy feet there. But inferential or argumentative pleading is not admissible. A fact can only be put in issue by a direct allegation in such a way that the party can take issue directly on it. There is no such allegation in this complaint. It is merely an allegation of what was contained in the Kinney deed—what it did contain on its face without saying that that amount of mining ground was there to be conveyed. There is no allegation on that point on which defendants could directly take issue; hence the existence of the amount of seventy and a frac-

tion feet is not admitted by the pleadings. The testimony on this point I do not propose to fully discuss, because I do not think it necessary to the decision of this case; but I will refer to some parts of it. Mr. James has been the surveyor of those claims ever since 1860 or 1861. He is the man of all others most thoroughly acquainted with that lead. Marlette was the county surveyor and surveyor-general, and did surveying there, and he confirmed him. The other parties have not surveyed it with a view of ascertaining the range, strike or direction of that lead. There is the testimony as to the general direction of the lead of Mr. Ashburner and the testimony of some others, but they have never surveyed it with the intent of ascertaining the strike of the lead, whereas James has been surveying there constantly from the beginning down to the present time, and knows all about it, if anybody does. Freeman established this base line as now claimed by counsel for the defendants, as early as May, 1860. Complainants' counsel had a map made from Clarence King's report, and claimed a right to refer to it, but it was not introduced in evidence. He claimed that the court should notice it as a public document, and I will refer to it also. James says that the Freeman base is parallel to the lode on that portion of the lead—as nearly parallel as a line can be drawn. Although it is not in evidence, the plat which purports to be a copy of the map of Clarence King, was used in argument by complainants' counsel, who claimed the right to refer to it, and claimed that it shows the claimants' base to be parallel to the lode or lead. That depends on what is called the course of the lode as laid down here—whether we take several miles in extent or take it in reasonable sections.

This part in yellow purports to be a section of the lode, as counsel say, fifteen hundred feet below the surface; therefore, it is below and to the eastward of the stake of the Ophir, and the base line drawn from it. If this green line representing the Freeman base were moved down three-fourths of an inch; if it be brought down to correspond with the level of the section, the green line from there to there (pointing), for the distance of nearly four thousand feet, or more than three-quarters of a mile, would run directly through the centre of the ledge, as claimed here by the defendants. If this represents the correct position of the ledge, fifteen hundred feet below the surface, and the green line on that part should be moved eastward, it would run directly through the centre of the ledge as laid down on the plat, for a space of about four thousand feet, which includes the Savage claim, and all north of it, up through and beyond the Ophir. The line as drawn on the plat simply cuts the bulge at the top. If this plat is correct, it is plain to be seen by the mere inspection, that the green line represents the course or strike of the ledge throughout this section of four thousand feet through the

whole length of Virginia City, much more nearly than the red one. But this plat is not a copy of Clarence King's map, except as to the section of the ledge laid down on it. The lines laid down showing the end lines of all these claims, are indicated on this map as at right angles to the red line; that is to say, the complainants' line. Whereas, in fact, on Clarence King's map these end lines of the claims are laid down so as to correspond very nearly with the testimony of James, and with the lines as laid down on the map of Virginia City, introduced in evidence, and on all the maps with which I am acquainted. I do not know why the lines were changed in making this copy, or what I understand purports to be a copy, of King's map. There is one line indicating what would be at right angles to the green line. The lines of the claims laid down hereon are drawn at right angles to the red line instead of the green line, as though they were copies from Clarence King's map. I don't know whether that was intended to be understood as showing the claim lines as on King's map or not. If it be so, it is not in accordance with the fact, because I took occasion to examine King's map myself, and the end lines of all those claims, as laid down on it, are located very nearly the same as they are represented on the Virginia City map introduced in evidence, and to which the testimony of James and other witnesses was directed, and at nearly right angles with the green line, or Freeman's base line. Not only that, but on every map I have ever seen, the end lines of those claims are laid down as running in the same direction at right angles with the Freeman base line. All public maps brought to my notice show these facts. I have at least four in my chambers which have been the subject of judicial investigation, drawn from official surveys, and every one lays the end lines down in the same position, or substantially the same, as those on the map introduced in evidence and as laid down substantially on Clarence King's map, and as have been adopted in government patents issued to those companies which have had their claims patented.

On that map of Virginia City, in evidence, the end lines of all those claims, from the Savage north, except these lines put on to show the claim of Kinney as claimed by him, are drawn at right angles to the defendants' base; that is to say, the Freeman base. The testimony shows that the claims have been held and worked from the earliest times down to the present. on that theory—have been possessed, owned and worked upon lines running in that direction. Kinney is the only one who claims a different line—and his associates did not admit his line, but claimed the other. The Mason survey, made for Kinney for the purposes of his suit, is the only survey shown as having been made in accordance with that one adopted by him. I do not understand it to be disputed that the White and Murphy line is established and fixed as drawn at

right angles to the Freeman base. If, then, Kinney's claim did not arise until the twenty-first of September, 1859, as he now claims, and the Booth claim until January, 1863, both are subsequent and subordinate to the other claims that were located on the Comstock lode, and must yield to them; those that were located, established, held and worked on the theory that the Freeman is the proper base line. Upon this view, then, there are only fifty feet, and not seventy and a fraction, as Kinney claims. I confess it looks to me from the testimony as if there were only fifty feet there. It is true, as argued, that the defendants have purchased seventy and a fraction feet, and issued stock on that basis. There is nothing necessarily strange in this in respect to mining claims. Parties often find it to their interest to buy up all outstanding claims, because this course is found cheaper than to litigate, and when they thus buy to quiet their titles and avoid litigation, it is not remarkable that the stock should be issued on the basis upon which they purchased. This course does not necessarily admit the validity of all the claims purchased. A party may buy his peace, without any prejudicial admission.

I do not propose to spend any further time in discussing this question now, nor to definitely decide this point at the present time. I do not know what may arise hereafter. I leave that question open, so far as I am concerned, for further consideration, if occasion should arise. I do not find it necessary for the purposes of this decision to pass definitely on that point. As that is the most favorable view for the complainants, I assume for the purposes of this decision, that there were seventy and one-tenth feet. But the testimony indicates that Kinney's claim on this point is wrong. If, however, it is right, and the other claims are maintained in their present positions, then his correction would be fruitless, because no part of the Kinney ground located at right angles with the Mason base—the base as claimed by complainants—having ore in it, is within the California ground, as now or ever possessed or claimed by the California Company, the north line of the White and Murphy being the dividing line between the present Consolidated Virginia and California Companies. It is only within the California ground, on the theory that the end lines are drawn at right angles to the Freeman base, and if so drawn, there can be but fifty feet in the whole claim. The ore sought to be secured on complainants' theory is not even in the White and Murphy ground, for their lines cross over the White and Murphy ground in the direction that the complainants claim their lines to run before getting down to the ore on the twelve hundred and thirteen hundred-foot levels, as the testimony shows; and the mine must be now worked on the Sides ground, beyond the White and Murphy to the south. And the lines, as claimed by Kinney, if continued below the present workings, will

soon cross the Best and Belcher into the Gould and Curry. At all events, no part of the bonanza which has been discovered, and which is sought to be recovered in this case, is within the White and Murphy ground, provided their lines are to remain as heretofore and now established, and much less within the possession or occupation of the California Company, whose claim is to the north of the White and Murphy. As I said before, I merely throw out these observations without passing definitely on the question.

Again, on the pleadings and exhibits and testimony, which are uncontradicted by Kinney, I do not think that there is any mistake that the court can be called on to correct. The parties on both sides were evidently dealing in admitted ignorance of the exact amount then unsold, unless they assumed that the deeds conveyed the correct amount of ground. Kinney both telegraphed and wrote to Heydenfeldt to sell all his ground. He made the deed himself by which he conveyed it to Heydenfeldt for the purpose of enabling him to sell all. He states what he considers to be the ground in the Kinney and Welton part. When he came to the Kinney ground, he states that the amount is unknown. He conveys by his deed to Heydenfeldt the undivided half part of the mine known as the Kinney and Welton. "The said Kinney and Welton consists of twenty and one-tenth (20 1-10th feet) on the ledge or lode, and adjoins the Central No. 2 mine on the south. Also, all the interest of said party of the first part, in the mine known as the Kinney (amount unknown); said Kinney mine adjoins the White and Murphy on the north, and consists of fifty feet on the ledge or lode." He says the amount is unknown in the Kinney ground. He directs Heydenfeldt by telegram and by letter to sell all. Heydenfeldt answers by telegram that he has sold all, and tells him the amount for which he sold, and directs him to draw on him for the amount. He did draw on him from time to time, by drawing check after check, till all was received. In his letter, however, he says there ought to be five feet more, and he thinks it must have been five feet in Mills, conveyed as security, which had never been reconveyed. But it turned out to have been reconveyed. He was uncertain as to the amount, and if he had any more, he did not know how much or where it was; and with knowledge of this fact, he made that conveyance, which he drew himself. He referred to the abstract of Heydenfeldt, which he had seen, and knew that it showed some title in him to two feet in the Kinney ground. He does not know where the rest is, and the amount is unknown. Heydenfeldt intended to sell all that Kinney had, and Flood intended to purchase and desired to purchase all the outstanding interests. Heydenfeldt did sell all, and he made his deed in the exact words of Kinney's deed to him, including "amount unknown." specified as in Kinney's deed. He thought there were two feet. He sold it as

two feet, and got payment for it as two feet; but his intention was to sell all, and Flood intended to buy all; and the mistake, if any, was as to what constituted "all." Kinney was in doubt himself, because he could not find more than two feet. Heydenfeldt was not satisfied that there was sufficient to answer the call for two feet—and Flood acted upon Heydenfeldt's view as to the amount—but Flood was willing to pay for two feet. They were both, therefore, as well as Kinney, conscious of the fact that the amount was uncertain, and dealt in view of that fact; and if now, after the elaborate efforts to make the exact facts appear, anybody should read the voluminous testimony with a view to find out whether there was, in fact, any more than two feet, he would find it very difficult, at least, to say there was, and still more difficult to determine exactly how and where it is to be located. Where parties deal with each other, with the knowledge and in view of the fact that something is uncertain as to the amount or condition of the subject-matter of their dealings, and the contract relating thereto is in the form intended, there is, under the authorities, no ground for correcting a mistake, if it should finally turn out that one had intervened. Undoubtedly Heydenfeldt intended to convey all; Flood intended to buy all; Heydenfeldt had authority to convey all, and it was intended to convey all. The conveyances were in the form intended; and Kinney, from time to time, extending through a period of a month, after information that all had been conveyed, and of the price for which all had been sold, drew the money. It turns out, if there was a mistake, that they were mistaken as to what "all" was. The deeds, both of them, had the forms which were intended. Kinney's deed was prepared by himself, and intended to cover all that there was in the mine. They were dealing with a matter of uncertainty, and at the time Kinney was satisfied. Long after that, when a rich mine had been developed by, and at the expense of, the defendants, Kinney begins to look up what he calls "his missing feet." He does not, even then, go to Heydenfeldt. He did write a letter to Heydenfeldt immediately after the sale, but before he drew his money, in regard to the five feet of Mills's ground, to which Heydenfeldt did not reply. He says he wrote other letters, but Heydenfeldt says he did not receive any, and I am satisfied he did not, and I believe none were written. He never did complain to Heydenfeldt, and he waited two years before he took any serious action, and until after the rich bonanza had been developed, and the expenditure of the defendants in this case, in developing the mine, had been incurred.

A principle, which is the result of the authorities all going to sustain it, is well stated by Story, and is applicable to this subject: "Relief will be granted in cases of written instruments, only where there is a plain mistake clearly made out by satisfactory proofs.

It is true that this, in one sense, leaves the rule somewhat loose, as every court is still left free to say what is a plain mistake, and what are proper and satisfactory proofs. But this is an infirmity incident to the very administration of justice, for in many cases judges will differ as to the result and weight of evidence; and consequently, they may make different decisions upon the same evidence. But the qualification is most material, since it cannot fail to operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal, or contradictory, or it is in its texture open to doubt, or to opposing presumptions. The proof must be such as to strike all minds alike, and must unquestionably be free from reasonable doubt." 1 Story, Eq. Jur. § 157.

Now that principle, established by the authorities, is well and very strongly expressed, and as counsel for the defendants very well remarked, if that is the rule, it cuts up this case by the roots. It is impossible to say that the complainants' right is clear; that there is a clear mistake in the conveyance made; that it is established by the testimony adduced in this case beyond all reasonable doubt. At least, so it seems to me. There is a late case in 93 U. S. 61, 62. which has some application to this subject. It is the case of Grymes v. Sanders. This, I take it, was a bill to rescind, rather than a bill to reform. I judge, from certain remarks of the court, that it was to rescind. At all events, the ground for relief was mistake. It was in the purchase of a mining claim in the state of Virginia. The principles are applicable to both kinds of relief. mistake in both being the ground. "Mistake, to be available in equity. must not have arisen from negligence where the means of knowledge were easily accessible. The party complaining must have exercised at least the degree of diligence which may be fairly expected from a reasonable person." Page 61. Again it is said: "Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he be silent. and continue to treat the property as his own, he will be held to have waived the objection, and will be as conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted. These remarks are peculiarly applicable to speculative property like that here in question, which is liable to large and constant fluctuations in value. A court of equity is always reluctant to rescind unless the parties can be put back in statu quo. If this cannot be done, it will give such relief only when the clearest and strongest equity imperatively demands it. Here the appellant received the money paid on the contract in entire good faith. He parted with it before he was aware of the claim of the appellees, and cannot conveniently restore it. The imperfect and abortive exploration made by Bowman has impaired the credit of the property Times have since changed. There is a less demand for such property, and it has fallen largely in market value."

There was certainly negligence in this case, on the part of Kinney, in not ascertaining the exact condition of the title. He knew what he once had. He knew what conveyances he had made. It is not pretended that he had forgotten any one of them. It was a mere matter of figures and calculation, unless it required some special genius to discover and locate the conveyances so as to work out the mistake. If he made a mistake, it was probably a mistake of law as to the effect of the judgment under which he claims a segregation. Again, the delay. He did not pursue the matter to see whether he had made a mistake or not. He could have as well ascertained at once, by a careful investigation, and before accepting the purchase money, whether he had in fact any more ground there, as to have waited two years before doing it. He accepted the purchase money after knowledge that all had been sold, and after his attention had been turned to the mistake, if any there was, and then waited two years, until his grantees, at their own expense, had developed a rich mine.

It is true, that they have been richly rewarded for their energy and expenditure. But they might not have been; they might not have found a rich mine; they might have expended large amounts of money, without finding a bonanza. It was their risk, and they took it. Kinney did not even pay, or help to pay, for the development which enabled him to sell at all. On the contrary, he declined to do it. The company offered a long time before to take his mining interest, and issue him stock for it. He refused, expressly on the ground. that in that case he would be obliged to pay the assessment. And Flood had two hundred dollars per foot back assessments to pay before he could get his stock for the interest purchased of Kinney, and conveyed to the other defendants. Kinney had declined to expend any further moneys, and then, after this sale and conveyance, had allowed defendants to go on and develop the mine, on the supposition that they owned it, until they discovered a bonanza. He allowed them to take the risk on themselves and develop a mine, and then he comes in two years afterward and claims that in the conveyance there was a mistake. When urged on by the prospect of large gains, he set to work to find a mistake, and upon the ingenious theory laid down here, he claims to have found one. So, again. with reference to the statu quo, the remarks will apply. The parties cannot be put in statu quo. They

cannot be put in the condition in which they were when this interest was bought and conveyed. Defendants, in good faith, relying on their title, have expended large sums of money and thereby developed a rich mine. They have very largely, enormously, I may say, enhanced the value of the property by their own labor and energy and the expenditure of their own money, which Kinney had declined to do, or to aid in doing. It is precisely the same principle applicable, to a greater or less extent, to bills to correct mistakes, as that applicable to a bill to rescind. Both rest upon the same equitable principles—upon the same equities.

In view of all these authorities and these rules of law, I do not think it possible for any one examining this record to say that there is clearly such a mistake here as to entitle the party to the relief sought at the hands of a court of equity.

With reference to Smith and Bryant. They have purchased in since the commencement of this action. Smith is complainants' principal counsel of record in the case. They have got a conveyance from Kinney since the commencement of this action, from the complainant in this suit, conveying to them all his rights in the mine. He stepped out, and they took the action on themselves—on their own shoulders. Now they claim on the ground that they are bona fide purchasers for value without notice of the prior conveyances; that they are not affected by the Mills deed, the Kinney deed, and the Long deed. They say they did not know anything about the Long deed, and they did not know anything about the Mills and Kinney deeds. They say the latter deeds were void, and conveyed nothing as to the grantees; that they took the title without notice of their prior equities, and, therefore, they have equities behind Kinney such as he had not. There are several difficulties in maintaining that proposition. The first difficulty to which I will call attention is the fact, that when they took their conveyance, Kinney had already conveyed to Heydenfeldt, and Heydenfeldt to the other defendants, by deeds in due form, duly acknowledged and recorded, and of these deeds they had notice. The legal title was in the defendants. Now if there was any equity which Kinney could have conveyed to anybody as against his prior vendees by reason of want of notice of the invalidity or irregularity of these deeds, he conveyed that equity, as well as the legal title, so far as he was able to do so, to defendants; so that both the equities, and the legal title in fact, passed to them by the prior conveyances, and there was nothing left in Kinney to convey to Smith and Bryant, except the equity which Kinney himself had against the defendants themselves, and not as against his prior grantees, to reform this instrument. If Kinney had any equity as against the defendants on which he could

obtain a reformation of this deed, it may be conceded that he conveyed that equity to Smith and Bryant; but he could convey nothing more, for there was nothing more in him to convey at the date of his deed to them. Defendants, through the deed to Heydenfeldt, not only acquired all that was possible for Kinney to convey, subject only to such equity as Kinney might have as against the defendants on the ground of mistake, but they had before acquired from Kinney's prior grantees the equities as against Kinney and Smith and Bryant, which those grantees obtained by virtue of the several purchases which the defective deeds were intended to consummate, and the defendants were in possession, both under their and Kinney's deeds at the date of Kinney's conveyance to Smith and Bryant. The defendants, therefore, not only had the legal title, but all the equities that Kinney himself and his prior grantees could convey, but they had the possession under their conveyances at the time of the conveyance to Smith and Bryant. These intervening equities of defendants as against all parties, and the legal title in them must be abrogated and disposed of by a reformation of the deed in question before Smith and Bryant's equities, which lie behind them, can attach as against Kinney's prior grantees; and that reformation must depend upon such equities alone as Kinney himself had and could enforce as against defendants.

So far then as the equity of Kinney, as against these defendants is concerned, conceding that he could convey it, he could only convey what he had to Smith and Bryant, and that is simply his equity to reform this deed. On this ground I think Smith and Bryant stand in no better position than their grantor, Kinney, and that they would have been in no better position than he, had they received their conveyance before the commencement of the suit, and they had brought the action themselves.

Another ground is that Smith and Bryant purchased pending the suit. I can see no reason why Smith and Bryant should not be bound by the decree in the suit, or why the decree should not be the same as it would have been if they had not purchased in and become parties by supplemental bill. If a different decree must be pronounced, there must be a change in the cause of action. By bringing them in, they must introduce a new cause of action; a cause of action different from that which was originally alleged in the case, or the decree must be the same. The supplemental bill only alleges a transfer of the complainants' interest pendente lite, and that Smith and Bryant are entitled to the same relief asked by Kinney in the original bill. It alleges no new or other equities—no new equities in favor of the original complainant's grantees—and there are no allegations upon which a decree for other rights than appear in the original

bill can be based. Smith and Bryant took the suit subject to any claim which the defendants could establish as against the complainant in the original bill. They had notice by the action of all the rights of the defendants, and they stand in no better condition than the original complainant.

Again, the defendants at the time of the conveyance to Smith and Bryant were in possession. The defendants were in actual, notorious, exclusive possession under their conveyances, both from Kinney and from his prior grantees. They had the legal title and the actual possession; and the possession itself was evidence of notice of defendants' rights which Smith and Bryant were bound to recognize. Such has been the rule with reference to land at all times, and it is so with reference to mining claims. Defendants' equities as against Kinney's prior grantees are, at least, equal to Smith and Bryant's against the same grantees, for defendants had conveyances from said prior grantees, and again from Kinney himself, conveying all that remained in him prior to the conveyances to Smith and Bryant, and were in possession, and their equities being at least equal to those of Smith and Bryant, the condition of the party in possession is best.

It was said in answer to this that other parties were in possession as well as defendants, because the possession of the defendants was the possession of their co-tenants. But Smith and Bryant did not get their title from those other parties. They derive their title from Kinney, not from those other parties, if any there be, and the defendants were the first to get the title from Kinney, and were themselves in possession adversely to him, while Kinney was not in possession at all at the time he made the conveyance to them. The defendants' possession was their own alone.

With reference to the Long deed: The Long deed was a valid deed as to Kinney. As to that, there is only the question of notice. That title had been conveyed to defendants, and they were in possession, claiming also under that title, and the possession under the title was notice to Smith and Bryant. Besides, the deed to Heydenfeldt perfected the title, and being on record, was notice to Smith and Bryant. It may be true, as stated, that Heydenfeldt did not know at the time of Kinney's conveyance to him, or at the time of the commencement of this suit, that the Long deed was in existence; but he derived title from parties who claimed under Long and under that deed—whose deeds were on record and who were generally recognized as long ago as 1862-3, as in possession in connection with Kinney, on that ground, and they went in possession under that deed. Some of the defendants' trustees —of the California Company's trustees—however, were aware of it. Williams was aware of it. He states that he knew all about the

existence of this Long deed, as he must have known from his relation to the suit in which it was recognized. At all events, the grantees of Long were in possession, and it was not necessary that defendants should be aware that there was in fact a deed from Kinney to Long. I have repeatedly held that in the early days, at Virginia, the transfer of the actual possession of a mining claim and submission to it by possession of the transferee acquiesced in—possession in pursuance of such a transfer acquiesced in—was a good transfer of a mining claim, independent of any deed. That was so held in the early days of California down to 1860. The supreme court of California subsequently held, though I dissented, that the statute of 1860 abrogated the rule. I thought that the act of 1860 was only intended to place a conveyance without seal upon the same footing as a conveyance with a seal. I am not aware that the latter rule has been adopted by the supreme court of Nevada. I have always held, and I shall continue to so hold till overruled by a higher court whose decision I am bound to follow, that the actual transfer of the possession of a mining claim in those early days with a view of transferring the title, followed by a possession under it acquiesced in, made it a valid transfer of a mining claim. I have so held repeatedly, and had occasion at the last term of the court in Nevada to so hold in a case against the Consolidated Virginia Company, where each party had found it essential to his case to maintain the proposition that a transfer of that kind was valid. Each one, to maintain his own case, had to insist on that proposition, and I sustained it.

In the case of 420 Mining Co. v. Bullion Min. Co. [Case No. 4,989], I held that a parol partition followed by possession acquiesced in in accordance with the parol partition, is a valid contract of partition of a mining claim, and if there is any partition at all in this case, there must have been either a prior parol partition recognized in the judgment appended as a supplemental judgment to the Central No. 2 Case, or else that record must be regarded as a valid contract of partition, and even that did not bind Jacobs and Weill, unless they subsequently acquiesced in it. I have held in other cases to the same effect. Any other ruling upon parol transfers, followed by possession, would disturb many old and highly valuable titles on the Comstock lode. There was no necessity then for a deed at that time, if there was an actual transfer of the possession, and an occupation in pursuance thereof acquiesced in. The defendants claim from the grantees of Long; and they must have known that Long claimed title under some one else, and there is no pretense that they came in under any one else but Kinney. The testimony shows that Long and his grantees must have been in possession, because they were sued as in possession, and they defended jointly

with their grantor Kinney. Kinney answered for them. It was enough that defendants knew that Long was in possession, claiming title, without knowing whether he got it by deed or by transfer of the actual possession. At all events, these defendants went into possession under title derived in part from Long, and their possession at the time of the conveyance to Smith and Bryant is notice of their claim to these complainants as to the Long title. Besides, the conveyance from Kinney, if there is no mistake which Kinney himself is entitled to have corrected, cured any defect in Long's conveyance. As to no part of these premises, do Smith and Bryant stand in any better position than the original complainant in this case.

To conclude, then, after a thorough examination of this case, having gone through the entire testimony from beginning to end, and having read all the material parts, two or more times over, not relying on the abstract of counsel, I think I understand it, and the more thoroughly I examine and comprehend it, the better satisfied I am that this case is utterly barren of any equities to sustain the claim set forth in the bill.

This case has been argued with great zeal and with very great ability, and certainly great ingenuity has been exercised in dividing up the seventy feet claimed to have been located by Kinney and Booth, in such a way as to cut out from these defendants the ground which they have purchased from Kinney and his grantees. They purchased the full amount of Kinney's part of the seventy feet and a fraction, paid for it, and got conveyances for it from Kinney and his grantees, whether they have got that amount of ground or not. It requires a good deal of ingenuity to divide this up; to transfer the claims of Booth and Kinney, the extra ten feet claimed by each, from the south to the north, and so arrange it as to apportion Kinney's conveyances in such a way as to have made Kinney to have sold and conveyed some portions several times over, and not to have sold other portions at all.

This case, I presume, will go to the supreme court. The amount involved—complainants aver that $20,000,000 have been extracted from the premises, of which they pray an account—is such, that if the parties have any confidence in their claim, they will be very likely to carry it further. I have endeavored to get at the merits of this case, to the bottom, to the "bed-rock"—to use a mining phrase appropriate to the occasion. I have spent a great deal of time on it, and I think I comprehend it: if not, it is fortunate for the complainants that it is an equity case, and so will go up on appeal, and not upon a writ of error. The supreme court tries the case de novo, without any regard to my decision or rulings, and it will give such judgment as the law and the evidence appear to that court to require. If there are any equities in the case, which my examination has failed to disclose, they will certainly not escape the notice of that distinguished tribunal. Let a decree be entered dismissing the bill with costs.